Scott McMILLAN, John Norberg, James M. Wilson Trust, Peggy Wilson Trustee, Castillian Ventures, Inc., individually, and on behalf of all others similarly situated, Plaintiffs,

v.

INTERCARGO CORPORATION, a Delaware Corporation, and Arthur J. Fritz, Jr., Kenneth A. Bodenstein, Arthur L. Litman, Albert J. Gallegos, Robert B. Sanborn, Michael L. Sklar, George J. Weise and Stanley A. Galanski, Defendants.

Civil Action No. 16963.

Court of Chancery of Delaware, New Castle County.

Submitted: March 3, 2000.
Decided: April 20, 2000.

Ronald A. Brown, Jr., Esquire, Bruce E. Jameson, Esquire, and Sheldon K. Rennie, Esquire, of Prickett, Jones & Elliott, Wilmington, Delaware; and R. Bruce McNew, Esquire, of Taylor Gruver & McNew, Greenville, Delaware, Attorneys for Plaintiffs.

David C. McBride, Esquire, Danielle Gibbs, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; of Counsel: David L. Schiavone, Esquire, Christopher Q. King, Esquire, Elena B. Gobeyn, Esquire, and Jason L. Rubin, Esquire, of Sonnenschein Nath & Rosenthal,

Chicago, Illinois, Attorneys for Defendants.

## OPINION

STRINE, Vice Chancellor.

Several stockholders of Intercargo Corporation have sued the (now former) directors of Intercargo (the "defendant directors") for breach of fiduciary duty in connection with the acquisition of Intercargo by XL America, Inc. for $12.00 a share (the "XL merger"). Earlier in this litigation, the plaintiffs sought a preliminary injunction against the consummation of the XL merger. That request was denied by Vice Chancellor Jacobs,[1] and the XL merger was approved by a vote of the Intercargo stockholders on April 29, 1999. Thereafter, the XL merger was consummated on May 7, 1999.

In their amended complaint,[2] the plaintiffs allege that the defendant directors breached their fiduciary duties of loyalty and care in two distinct ways. First, the plaintiffs allege that in connection with the XL merger, which was a change of control transaction,[3] the defendant directors failed to ensure that the Intercargo stockholders received the highest value reasonably attainable and thus did not live up to their so-called *Revlon*[4] duties (the plaintiffs' "*Revlon* claim"). Second, the plaintiffs allege that the defendant directors failed to disclose material information to the Intercargo stockholders that bore on the stockholders' decision whether to approve the XL merger (the plaintiffs' "disclosure claims").

The defendant directors have moved for judgment on the pleadings. In this opinion, I grant the defendant directors' motion for the following reasons.

The XL merger has been consummated and rescission is not a practicable remedy. Therefore, the plaintiffs are left with a claim for damages against the defendant directors. Because Intercargo's certificate of incorporation contained an exculpatory provision immunizing its directors from liability for due care violations, the plaintiffs may survive this motion only if the complaint contains well-pleaded allegations that the defendant directors breached their duty of loyalty by engaging in intentional, bad faith, or self-interested conduct that is not immunized by the exculpatory charter provision.

After according the plaintiffs the favorable inferences owed to them in this procedural posture, I conclude that the complaint fails to allege such a breach of the duty of loyalty. The plaintiffs concede that a majority of Intercargo's board was disinterested and independent, and the plaintiffs have failed to allege facts that, if true, support a reasonable inference that the loyalties of two of the other three directors were conflicted. And even if one or more of those three directors were interested in the merger, the plaintiffs have failed to allege that those directors dominated or controlled, or otherwise influenced in any improper way, the concededly disinterested board majority.

Finally, the complaint itself paints a picture that is incongruent with a loyalty breach. The complaint:

- admits that the Intercargo board engaged an investment banker to look for a buyer;
- does not allege that the Intercargo board instigated its search for a buyer because it was faced with a hostile bid or otherwise feared an unfriendly overture;

1.  *See McMillan v. Intercargo Corp. ("Intercargo I")*, Del. Ch., C.A. No. 16963, 1999 WL 288128, mem. op., 1999 Del. Ch. LEXIS 95, Jacobs, V.C. (May 3, 1999).

2.  Which I refer to for brevity's sake as the complaint.

3.  *See generally Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42–48 (1993).

4.  *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986).

- fails to allege that the Intercargo board ever rebuffed any other potential bidders; and
- falls back on allegations that the XL merger agreement contained relatively standard termination fee and no-shop provisions that cannot be deemed preclusive.

In sum, the complaint alleges no facts from which a reasonable inference can be drawn that any conflicting self-interest or bad faith motive caused the defendant directors to fail to meet their obligations to seek the highest attainable value or to provide the Intercargo stockholders with all material information.

## I. *Factual Background*

### A. *The Merger Partners*

Defendant Intercargo is a Delaware corporation that specialized in underwriting marine insurance. As of the time of the XL merger, Intercargo had 7.3 million outstanding common shares. At the $12.00 per share merger price, the equity value placed on Intercargo in the XL merger was approximately $88 million.

XL Capital Ltd. is a Cayman Islands corporation that functions as a holding company for subsidiaries in the insurance industry. Its subsidiaries operate in the insurance, reinsurance, and financial risk protection industries on an international basis.

XL Capital used its indirectly wholly-owned subsidiary, XL America, a Delaware corporation, as its acquisition vehicle for its transaction with Intercargo. XL America serves as XL Capital's holding company for its American insurance operations. For ease of reference, I hereinafter refer to XL Capital and XL America indistinguishably as "XL."

### B. *The Defendant Directors*

The complaint's allegations regarding the defendant directors are sparse at best. The Intercargo board was comprised of eight directors. As to five of the defendant directors—a clear board majority—the complaint simply states each defendant's name and status as a director. Thus the complaint alleges no facts suggesting that the independence and disinterestedness of these five directors were in any way compromised. The complaint is devoid of facts suggesting any motive on the part of these five directors to do anything other than advance the best interests of Intercargo and its stockholders.

The complaint contains somewhat more information about the three other defendant directors. As to defendant Stanley A. Galanski, the complaint alleges that he was the President, Chief·Executive Officer, and director of Intercargo. Without explaining the terms of his post-merger employment, the complaint states that Galanski "is personally interested in the Merger because he is being hired by XL."[5]

As to defendant Michael L. Sklar, the complaint alleges that Sklar was a partner in the Chicago law firm of Rudnick & Wolfe, which was Intercargo's primary outside counsel before the merger and which represented Intercargo in the merger with XL. Nothing in the complaint indicates that Sklar or Rudnick & Wolfe stood to obtain legal work from XL after the merger.

As to defendant Robert B. Sanborn, the complaint alleges that he served on the Intercargo board at the request of Orion Capital Corporation, which owned 26% of Intercargo's stock and had agreed to vote for the merger. The complaint refers to the fact that the proxy statement indicated that " '[a]s a designee of Orion, Mr. Sanborn's investment aims may differ from those of some stockholders. . . .' In addition, the proxy statement discloses that during at least one [Intercargo] board meeting at which XL's offer was discussed, 'Mr. Sanborn excused himself from the meeting upon the commencement of the discussion regarding the Company's stra-

---

5. Compl. ¶ 49.

tegic alternatives.' " [6]  According to the complaint, this unexplained recusal clearly demonstrates that there "is an undisclosed conflict between Orion and [Intercargo's] other stockholders. . . ." [7]

## C. *The Complaint's Allegations Regarding The Defendant Directors' Compliance With Their Revlon Duties*

As is the case when ruling on any motion addressed solely to the pleadings, the court finds itself in the sometimes frustrating position of being confined to the allegations of the complaint.[8]  This constraint is more frustrating than usual in a case like this, when the court has already decided a motion for a preliminary injunction and when the complaint is largely a selective compilation of snippets from a proxy statement that the court is not able to consider in full.  Nonetheless, a standard is a standard, and the following facts are drawn exclusively from the complaint.  To be candid, the court must fill in some of the interstices in order to make sense of the facts because the plaintiffs have, understandably, rendered them in a fashion designed to denigrate, rather than praise, the defendant directors' actions.[9]

For example, the idea of selling Intercargo in a change of control transaction did not originate with XL. Rather, the complaint acknowledges that the proxy statement indicates that the investment bank of Fox–Pitt, Kelton, Inc. ("FPK") was engaged by the Intercargo board in Spring 1998 to help the board look for strategic alternatives, including a possible sale of the company.  FPK's engagement and its purpose were not publicly disclosed by Intercargo until after the XL merger was announced.

In the course of FPK's search for strategic alternatives, " 'FPK evaluated twenty-seven prospective purchasers of the Company, and the Company entered into confidentiality agreements with eleven prospective purchasers.  All of these entities received confidential information about the Company, and several conducted due diligence.' " [10]  Because the proxy statement "says . . . only that 'FPK evaluated' 27 possible buyers[,]" the complaint asserts that "all 27 were not solicited." [11]  Indeed, the complaint characterizes the efforts of FPK as a "secret private non-public solicitation of a few unidentified, hand-. . . picked potential buyers [which] was not a reasonable procedure to sell [Intercargo] under the circumstances." [12]

In the midst of this process of identifying possible strategic partners, XL somehow arrived on the scene on June 19, 1998 and signed a confidentiality agreement. The complaint does not say how XL got involved but notes that the "proxy statement does not even say that XL was one of the companies contacted [by FPK]." [13]

By June 23, 1998, XL had sent Intercargo a proposal to acquire all of Intercargo's shares at $14.00 a share.  The complaint then confusingly skips to December 2, 1998, when Intercargo's board announced that it had accepted an offer from XL to purchase all of the stock of Intercargo at $12.00 a share.[14]

The complaint gives no coherent explanation as to why the Intercargo board accepted $2.00 less a share than XL's ini-

---

6.  *Id.* ¶ 47.

7.  *Id.*

8.  *See* § II, *infra.*

9.  For a less constrained rendition of the facts, the interested reader is directed to Vice Chancellor Jacobs' preliminary injunction opinion. *Intercargo I,* mem. op., 1999 WL 288128, 1999 Del. Ch. LEXIS 95.

10.  Compl. ¶ 25.

11.  *Id.*

12.  *Id.*

13.  *Id.* ¶ 26.

14.  According to the proxy statement, this price represented an 18.5% premium over the preannouncement trading price of Intercargo's stock.  Proxy Statement, at 5.

tial overture. It does, however, provide glimpses of why that might have been so. For example, the complaint indicates that Intercargo's stock traded at the $12–13 price for the first half of 1998 but had fallen to the $10–12 level by September 1998, a price level that led Intercargo to repurchase 400,000 of its shares in the marketplace between September and November of that year. Indeed, in another section of the complaint dealing solely with the plaintiffs' disclosure claims, the complaint states that on September 24, 1998, "XL reduced its offering price to $12 per share based solely on 'volatility in the capital markets [that] had resulted in a general decline in the valuations of insurance companies, including both Intercargo and XL Capital."[15]

The complaint also asserts that Intercargo's "reorganization strategy ... combined with recent difficult market conditions (including well publicized problems in Asian markets) [had] caused [Intercargo's] recent financial results to be artificially depressed to some extent and to fail to reflect [Intercargo's] true worth."[16] In support of their contention that these problems were short-term in nature, the plaintiffs quote a public statement in which Intercargo's CEO, defendant Galanski, explained that the company's strategy had not yet produced bottom-line results but that management was continuing efforts to increase premiums, reduce losses, and cut expenses so as to improve the company's profitability.[17] According to the complaint, Intercargo in the Fall of 1998 "had a strategic plan to maximize long-term stockholder value and was well underway with its implementation of that plan."[18]

Not only that, Intercargo's balance sheet was strong. The company had sold a subsidiary for $41 million in cash in 1997, still had that cash on hand, owed no debt, and had cancelled its bank credit line because its resources were more than adequate to fund its operations. As a result, the complaint avers that Intercargo was an "extremely attractive acquisition candidate."[19]

According to the complaint, the defendant directors failed, however, to obtain an adequate price for Intercargo by bungling the auction process. The complaint claims that "an aggressive public 'shopping' strategy was ... the only reasonable way to ensure that, if [Intercargo] [was] to be sold and its publicly announced ongoing long-term plan [was] to be abandoned, the highest value [would be] obtained for ... [Intercargo's] ... stockholders."[20] But "[e]ven assuming that an 'auction' was not required, a more thorough, publicized and aggressive search for potential bidders was the only reasonable course of action under the circumstances."[21]

The complaint also alleges that the merger agreement contained an preclusive and coercive termination fee of $3.1 million plus expenses. The fee equals approximately 3.5% of the $88 million value placed on Intercargo's equity in the XL merger. The complaint also alleges that the merger agreement contained a preclusive no-shop provision that prevented the Intercargo board from actively seeking a better transaction after the board had executed the merger agreement.

Without linkage to either of these assertedly preclusive provisions, the complaint states that two other companies, Swiss Re and Houston Casualty Corp., would have been "interested in negotiating a merger with Intercargo," if they have

---

15. *Id.* ¶ 46.

16. *Id.* ¶ 29.

17. *Id.*

18. *Id.*

19. *Id.* ¶ 32.

20. *Id.* ¶ 31.

21. *Id.* ¶ 32.

been "given an opportunity[.]"[22] The complaint does not assert that Swiss Re or Houston Casualty were prepared to make a bid higher than $12.00 a share or that they were in fact precluded doing so by the termination fee or no-shop.

Thus while the complaint is replete with assertions that the defendant directors' actions were unreasonable,[23] imprudent,[24] or inappropriate,[25] it contains precious few allegations bearing on the improper motivations the defendant directors had for intentionally or in bad faith conducting a less than professional search for the best value for Intercargo.

The most specific allegations of the complaint in this regard are as follows:

- "The defendants sold the Company to XL apparently because they believed that [Intercargo] and its management, including defendant Galanski, who will continue as President and CEO of [Intercargo] after the Merger, would fit in and work well with XL, which is also an insurance company. That simply was not the appropriate standard for determining to sell the Company."[26]

- "Defendants acted [o]n a misplaced and improper desire to engender favor with XL and to enhance their chances to maintain their employment."[27]

- "Since [defendant] Sanborn excused himself from a key board meeting [as a result of his status as a nominee of Orion], there clearly is an undisclosed conflict between Orion and the Company's other stockholders[.]"[28]

### D. *The Plaintiffs' Disclosure Claims*

For reasons I will soon discuss, there is no need to detail the disclosure claims set forth in the complaint. These claims are essentially unchanged from those ably considered by Vice Chancellor Jacobs in his opinion rejecting plaintiffs' application to enjoin the XL merger.[29] The disclosure claims rest upon various items of information that the plaintiffs claim were material to the Intercargo stockholders' decision whether to vote for the XL merger, allegedly would have tended to cast doubt on the wisdom of the merger, and were not included in the merger proxy materials. Vice Chancellor Jacobs concluded that none of the omitted information was material.[30]

What is most important for present purposes is the fact that the complaint pleads nothing reasonably supportive of the proposition that any omission from the merger proxy statement resulted from disloyalty (including bad faith) on the part of the defendant directors. The complaint does allege that the defendant directors "in a knowing and bad faith manner" failed to disclose all material facts. Yet the complaint pleads no facts corroborative of that assertion aside from the facts that defendant Galanski was going to work for XL after the merger, that defendant Sklar was a Rudnick & Wolfe partner, and that defendant Sanborn was an Orion designee.

### II. *Procedural Standard*

This court will grant a motion for judgment on the pleadings pursuant to Court of Chancery Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law.[31] When considering a Rule 12(c)

22. *Id.* ¶ 24.

23. *E.g., id.* ¶¶ 1, 24, 25, 26, 31, 32, 33, 37.

24. *Id.* ¶ 30.

25. *E.g., id.* ¶¶ 31, 32, 33, 34, 40.

26. *Id.* ¶ 26.

27. *Id.* ¶ 39.

28. *Id.* ¶ 47.

29. *Intercargo I*, mem. op., at 12–26, 1999 WL at *5–*9, 1999 Del. Ch. LEXIS 95, at *15–*35.

30. *Id.*

31. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, Del.Supr., 624 A.2d 1199, 1205 (1993).

motion, the court must assume the truthfulness of all well-pled allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff.[32] The court must therefore accord plaintiffs opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Rule 12(b)(6). As on a Rule 12(b)(6) motion, however, a court considering a Rule 12(c) motion will not rely upon conclusory allegations of wrongdoing or bad motive unsupported by pled facts.[33] "Although 'all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true.' That is, '[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.'"[34]

██ In analyzing a motion to dismiss, the court may consider, for carefully limited purposes, documents integral to or incorporated into the complaint by reference.[35] This same standard logically applies on a Rule 12(c) motion as well. In this case, therefore, I may consider the proxy statement in determining whether the non-disclosures alleged by the plaintiffs were material in light of what was in fact disclosed by the proxy.[36] But, as a general matter, I cannot consider the proxy statement in determining whether the plaintiffs' *Revlon* claim is viable.[37]

### III. Legal Analysis

### A. Rescission Is Not An Available Remedy And Therefore The Plaintiffs' Only Remedy Is A Damages Award Against The Defendant Directors

██ At this stage of this case, the plaintiffs are left with a suit for money damages. Having unsuccessfully attempted to obtain an injunction against the consummation of the merger, the metaphorical merger eggs have been scrambled. Under our case law, it is generally accepted that a completed merger cannot, as a practical matter, be unwound.[38] In this case that is particularly true because XL was an armslength, third-party purchaser that has not even been alleged to have aided and abetted the alleged breaches of fiduciary duty by the Intercargo defendant directors.

Because rescission is not an available remedy and the plaintiffs possess only a claim for damages against the defendant directors, it is therefore necessary to give careful consideration to the facts the plaintiffs must plead to state a claim for damages.[39]

**32.** *Id.; Weiss v. Samsonite Corp.*, Del. Ch., 741 A.2d 366, at 371, mem. op. at 9, 1999 Del. Ch. LEXIS 127, at *11, Jacobs, V.C. (June 14, 1999), *aff'd,* Del.Supr., 746 A.2d 277 (1999); *see also Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 n. 6 (1988) (same standard under Rule 12(b)(6)).

**33.** *Kahn v. Roberts*, Del. Ch., C.A. No. 12324, mem. op., at 6, 1994 WL 70118, at *5, 1994 Del. Ch. LEXIS 33, at *5, Hartnett, V.C. (Feb. 28, 1994).

**34.** *In re Lukens Inc. Shareholders Litig.*, Del. Ch., 757 A.2d 720, 727 (1999) (*quoting Grobow*, 539 A.2d at 187 & n. 6.).

**35.** *In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69–70 (1995).

**36.** *Id.*

**37.** *Id.*

**38.** *Gimbel v. Signal Cos., Inc.*, Del. Ch., 316 A.2d 599, 603 (1974), *aff'd,* Del.Supr., 316 A.2d 619 (1974); *In re Lukens*, 757 A.2d at 728; *Goodwin v. Live Entertainment, Inc.*, Del. Ch., C.A. No. 15765, mem. op. at 3, 1999 WL 64265, at *6 n. 3, 1999 Del. Ch. LEXIS 5, at *16 n. 3, Strine, V.C. (Jan. 22, 1999), *aff'd,* 741 A.2d 16 (1999).

**39.** *See Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361, 1374 (1995) (discussing the difference between the standard that a court uses to determine whether to enjoin a transaction and the one it uses to determine whether to hold directors liable for damages).

B. *The Intercargo Certificate Of Incorporation Bars A Damages Award Against The Defendant Directors For Breach Of Their Duty of Care*

■ Intercargo's certificate of incorporation contains an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7) that immunizes Intercargo's directors for liability for monetary damages as a result of a breach of their duty of care.[40] As a result, the plaintiffs' *Revlon* and disclosure claims are dismissed to the extent that those claims are premised upon allegations that the defendant directors failed to meet the requisite standard of care.

C. *Because The Plaintiffs' Due Care Claims Are Not Cognizable, The Complaint Must Be Dismissed Unless It States A Claim That The Defendant Directors Breached Their Duty of Loyalty*

The exculpatory certificate provision has an important, but confined, influence on the court's analysis of this motion. Because the plaintiffs may not recover damages for a breach of the duty·of care by the defendant directors, the court's focus is necessarily upon whether the complaint alleges facts that, if true, would buttress a conclusion that the defendant directors breached their duty of loyalty or otherwise engaged in conduct not immunized by the exculpatory charter provision.[41] If the defendants meet the onerous burden of demonstrating that the complaint does not—under the pro-plaintiff standard applicable under Rule 12(c)—state a claim that is not barred by the exculpatory charter provision, then the defendant directors are entitled to dismissal.[42]

■ Under this approach, the defendants do not obtain a dismissal of the plaintiffs' loyalty claims as a result of the exculpatory charter provision; they obtain a dismissal *because* the complaint fails to properly plead a loyalty claim or another claim premised on behavior not immunized by the exculpatory charter provision.[43] The effect of the exculpatory charter provision is to guarantee that the defendant directors do not suffer discovery or a trial simply because the plaintiffs have stated a non-cognizable damages claim for a breach

40. Defs. Ex. A. The court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings. *E.g., In re Wheelabrator Technologies, Inc. Shareholders Litig.*, Del. Ch., Cons.C.A. No. 11495, mem. op. at 21–22, 1992 WL 212595, at *11, 1992 Del. Ch. LEXIS 196, at *38, Jacobs, V.C. (Sept. 1, 1992).

41. Most of the statute's exceptions simply iterate particular examples of breaches of the duty of loyalty. For example, the statute provides exceptions for conduct not in good faith, intentional misconduct, and knowing violations of the law—quintessential examples of disloyal, i.e., faithless, conduct. *See In re ML/EQ Real Estate Partnership Litig.*, Cons. C.A. No. 15741, mem. op. at 9, 1999 WL 1271885, at *4 n. 20, 1999 Del. Ch. LEXIS 238, at *16 n. 20, Strine, V.C. (Dec. 20, 1999) (explaining that bad faith conduct is, by definition, disloyal conduct), *rearg. denied*, Del. Ch., mem. op., 2000 WL 364188, 2000 Del. Ch. LEXIS 47, Strine, V.C. (Mar. 22, 2000); *In re Gaylord Container Corp. Shareholders Litig.*, Del.Ch., 753 A.2d 462, 475 n. 41, Strine, V.C. (Jan. 26, 2000) (same).

42. *In re General Motors Class H Shareholders Litig.*, Del. Ch., 734 A.2d 611, 619 n. 7 (1999); *In re Lukens*, 757 A.2d at 733; *In re Frederick's of Hollywood, Inc. Shareholders Litig.*, Del. Ch., Cons.C.A. No. 15944, mem. op. at 16, 2000 WL 130630, at *6, 2000 Del. Ch. LEXIS 19, at *20, Jacobs, V.C. (Jan. 31, 2000).

43. By showing that the certificate of incorporation bars duty of care claims *and* by further demonstrating that the well-pled allegations of the complaint fail to support a claim that the defendant directors engaged in non-immunized conduct, the defendant directors meet their affirmative duty to justify dismissal of the entire complaint under *Emerald Partners v. Berlin*, Del.Supr., 726 A.2d 1215, 1224 (1999). *In re General Motors Class H. Litig.*, 734 A.2d at 619 n. 7; *see also In re Frederick's of Hollywood*, mem. op. at 16, 2000 WL 130630, at *6, 2000 Del. Ch. LEXIS 19, at *20; *In re Lukens*, 757 A.2d at 733 n. 33.

of the duty of care.[44] To give the exculpatory charter provision any less substantial effect would be to strip away a large measure of the protection the General Assembly has accorded directors through its enactment of 8 *Del. C.* § 102(b)(7).[45]

When applying this approach in this case, I will focus on the question of whether the plaintiffs have stated a claim that the defendant directors—as a result of bad faith, self-interested, or other intentional misconduct rising to the level of a breach of the duty of loyalty—failed to seek the highest attainable value for Intercargo's stockholders and/or failed to provide Intercargo stockholders with all the material information necessary to determine whether to approve XL's offer.[46] I begin with the plaintiffs' *Revlon* claim.

D. *Does The Complaint State A Claim That The Defendant Directors Breached Their Duty Of Loyalty And Thereby Failed To Obtain The Highest Value Reasonably Attainable?*

▮▮▮ Once a board of directors determines to sell the corporation in a change of control transaction—as the Intercargo board did—their responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders.[47] "This obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and 'there is no single blueprint that a board must follow to fulfill its [*Revlon*] duties.... Rather, the board's actions must be evaluated in light of the relevant circumstances to determine if they were undertaken with due diligence and good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.'"[48]

▮▮ The fact that a corporate board has decided to engage in a change of control transaction invoking so-called *Revlon* duties does not change the showing of culpability a plaintiff must make in order to hold the directors liable for monetary damages. For example, if a board unintentionally fails, as a result of gross negligence and not of bad faith or self-interest, to follow up on a materially higher bid and an exculpatory charter provision is in place, then the plaintiff will be barred from recovery, regardless of whether the board was in *Revlon*-land.[49]

As applied to this case, this means that the defendant directors are entitled to dismissal unless the plaintiffs have pled facts that, if true, support the conclusion that the defendant directors failed to secure the highest attainable value as a result of their own bad faith or otherwise disloyal conduct.[50] Absent well-pled facts supporting

---

**44.** *In re Lukens,* 757 A.2d at 734.

**45.** *Goodwin v. Live Entertainment,* mem. op. at 50 n. 17, 1999 WL 64265, *24 n. 17, 1999 Del. Ch. LEXIS 5, at *76 n. 17.

**46.** The plaintiffs have not argued that any other exception under § 102(b)(7) is applicable.

**47.** *QVC,* 637 A.2d at 44; *Revlon,* 506 A.2d at 182.

**48.** *Goodwin,* mem. op. at 41–42, 1999 WL 64265, *21, 1999 Del. Ch. LEXIS 5, at *63 (*quoting Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279, 1286 (1989)).

**49.** *Goodwin,* mem. op. at 10, 41–42, 1999 WL 64265, at *5, *20, 1999 Del. Ch. LEXIS 5, at *15, *63; *In re Lukens,* 757 A.2d at 730–732, mem. op. at 19–23, 1999 Del. Ch. LEXIS 233,

at *26–*33; *In re Frederick's of Hollywood,* mem. op. at 13–14, 2000 WL 130630, at *5–*6, 2000 Del. Ch. LEXIS 19, at *16–*17; *see also Cooke v. Oolie,* Del. Ch., C.A. No. 11134, mem. op. at 34, 1997 WL 367034, at *12, 1997 Del. Ch. LEXIS 92, at *46, Chandler, V.C. (June 23, 1997) (claim that defendants breached their duty of care by failing to pursue the transaction offering the best value was barred by exculpatory charter provision).

**50.** *Goodwin,* mem. op. at 10, 41–42, 1999 WL 64265, at *5, *20, 1999 Del. Ch. LEXIS 5, at *15, *63; *In re Lukens,* 757 A.2d at 729–732, mem. op. at 19–23, 1999 Del. Ch. LEXIS 233, at *23–*33; *In re Frederick's of Hollywood,* mem. op. at 13–14, 2000 WL 130630, at *5–*6, 2000 Del. Ch. LEXIS 19, at *16–*17.

an inference of such disloyalty, the defendant directors are entitled to dismissal.

Here, the plaintiffs have fallen far short of pleading facts supporting a reasonable inference of disloyalty. A number of reasons compel this conclusion.

As an initial matter, it is apparent that the plaintiffs have not even mounted a challenge to the independence or disinterestedness of a majority of the Intercargo board. The independence and disinterestedness of five of the eight directors is unchallenged. The presence of an unconflicted board majority undercuts any inference that the decisions of the Intercargo board can be attributed to disloyalty.

And the challenges the plaintiffs do mount to the disinterestedness of the other Intercargo directors are extremely weak. The attack on defendant Sklar depends entirely on Sklar's partnership in Rudnick & Wolfe, Intercargo's outside counsel. If, as the plaintiffs allege, Intercargo had a long-term business plan that would make the company prosper, why would Sklar urge a change of control transaction at a less than optimum price? Would not this tend to be self-destructive in that it would subject Rudnick & Wolfe to the substantial risk of losing a client? Frankly, I don't get it, especially because the plaintiffs do not allege that Rudnick & Wolfe was promised a continued role as counsel for XL (on behalf, for example, of its new Intercargo operations).

The plaintiffs' most substantial attack on a defendant's motive is mounted as to defendant Galanski, who was Intercargo's CEO. According to the plaintiffs, Galanski was motivated to support a subpar deal with XL because XL promised him future employment, the terms of which the plaintiffs do not bother to specify. They ask me to infer that Galanski was motivated not by a desire to get the highest value but to secure a buyer who would keep him on board. At the same time, I am told that Galanski was implementing a long-term strategy that would deliver greater value and that the market did not know Intercargo was for sale.

If Galanski was motivated by entrenchment purposes, why did he apparently support Intercargo's voluntary, uncoerced search for a buyer? Shareholder plaintiffs usually attack the motivations of managers who resist change of control transactions in favor of their own status quo strategies. In this case, the plaintiffs attack the motivation of a CEO who worked with his board to retain an investment bank to look for buyers. The sole basis for this attack is that the CEO was asked by the ultimate buyer to stay on. The plaintiffs do not even allege that the CEO was hired by XL on terms materially more favorable than his (apparently non-threatened) employment with Intercargo.[51] Under our law, I am skeptical that, but need not decide whether, this attack creates a doubt about Galanski's disinterestedness in evaluating the XL merger.[52]

Even less substantial is the plaintiffs' challenge to defendant Sanborn's disinterestedness. Because Sanborn was nominat-

[51]. Although not cognizable on this motion, fairness to Galanski dictates noting that the reason for the lack of such allegations may be that the proxy statement indicates that Galanski's 1997 and 1998 base salaries from Intercargo were $260,000 and $265,000 per year on an annualized basis and that he agreed to stay on with XL for a base salary of $275,000 a year—a rather modest increase of approximately 4%. Proxy Statement at 13 & E–49 (Defs.Ex. B).

[52]. *Compare Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1170 (1995) (director's "hope" for better employment is not material under standard applicable for analyzing whether a director's non-§ 144 "interest" is sufficient to compromise the director's disinterestedness) *with Goodwin*, mem. op. at 52–53, 1999 WL 64265, at *25–*26, 1999 Del. Ch. LEXIS 5, at *79–*80 (where there was admissible evidence that two directors were bargaining with the acquiror for employment on enhanced terms after the merger, the court held that there was a triable issue whether their "expectations constituted a material interest in the merger not shared by the stockholders").

ed to the board by Orion · and because Sanborn recused himself from a board meeting because of that affiliation, the plaintiffs allege that Sanborn was conflicted. Citing an Orion 10–K that indicates that Orion had decided to sell its position in Intercargo—a fact that appears nowhere in the complaint and thus is not even properly raised—the plaintiffs contend that Orion was anxious to sell its position and was willing to sell at less than the best price. The defendants retort that Sanborn stepped out of the meeting, which occurred in September 1998, because Orion was a potential rival bidder and Sanborn did not want to taint the process. If so, his decision to recuse seems in keeping with high standards of directorial conduct.

■ Most important, the plaintiffs have not pled facts suggesting that Orion was anxious to engage in a fire sale. Had Orion wished to sell out fast, it had options of its own and could have marketed its own quite valuable block. The normal presumption is that the owner of a substantial block who decides to sell is interested in obtaining the highest price.[53] The plaintiffs' brief—the facts supporting this argument are, it bears emphasis, not in the complaint—avers no facts that reasonably support the inference that this presump-

tion·should not apply to Orion's investment in Intercargo.

■ These attempts to plead facts compromising the loyalty of Galanski, Sklar, and Sanborn are not merely weak. They are also unaccompanied by allegations that any of these defendants dominated or controlled the other members of the Intercargo board. Nor does the complaint allege that Galanski, Sklar, or Sanborn misled or deceived their fellow board members in any manner. And the complaint fails to set forth facts indicating why the disinterested board majority would sell out Intercargo's stockholders simply so as to secure Galanski's employment—an employment that could have been secured, according to plaintiffs, simply by continuing to manage the company under its existing business plan. The absence of well-supported allegations of this kind bolsters my conclusion that the complaint fails to plead actionable disloyalty.[54]

The dearth of well-pled facts suggesting improper motives on the part of the Intercargo board is coupled with less than compelling allegations regarding the unreasonableness of the board's compliance with its *Revlon* duties. Although the complaint takes issue with the board's decision to

53. *Goodwin*, mem. op. at 47, 1999 WL 64265, at *23, 1999 Del. Ch. LEXIS 5, at *71–*72, (*citing Cinerama*, 663 A.2d at 1143; *Yanow v. Scientific Leasing, Inc.*, Del. Ch., C.A. Nos. 9536, 9561, 1988 WL 8772, at *5, Jacobs, V.C. (Feb. 5, 1988, rev. Feb 8, 1988)).

54. In a case involving a merger with a genuine third-party acquiror:

the plaintiff must show that [the] materially self-interested members [of the board] either: a) constituted a majority of the board; b) controlled and dominated the board as a whole; or c) i) failed to disclose their interests in the transaction to the board; ii) and a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction. *Cinerama*, Del.Supr. 663 A.2d at 1168 (*citing Cinerama, Inc. v. Technicolor, Inc.*, Del. Ch., 663 A.2d at 1134, 1153 (1994) (subsequent history omitted)). Absent such a showing, the mere presence of a conflicted director or an

act of disloyalty by a director, does not deprive the board of the business judgment rule's presumption of loyalty. [*Cede & Co. v. Technicolor* ("*Cede II*"), Del.Supr.], 634 A.2d [345,] 363 [ (1993) ].
*Goodwin*, mem. op. at 51, 1999 WL 64265, at *25, 1999 Del. Ch. LEXIS 5, at *77; *see also In re Lukens*, 757 A.2d at 730 (where CEO was to receive a $20 million golden parachute payment as a result of a sales transaction but there was no allegation that he dominated or controlled the board, there was "no basis to say that the board as a whole lacked independence"); *In re Frederick's of Hollywood*, mem. op. at 17, 2000 WL 130630, at *7, 2000 Del. Ch. LEXIS 19, at *22 (where only one director was interested, where board majority that approved merger was disinterested, and where there was no allegation that the sole interested director dominated or controlled the board, "the duty of loyalty claim fails for lack of a valid premise").

conduct its search for a buyer through the non-public efforts of an investment banker,[55] this is the sort of quibble that, at best, raises a due care claim under Delaware law.[56] Whether it is wiser for a disinterested board to take a public approach to selling a company versus a more discreet approach relying upon targeted marketing by an investment bank is the sort of business strategy question Delaware courts ordinarily do not answer.[57] This case provides no basis for an exception to that approach.

Nor do the rather ordinary "deal protection" provisions of the merger agreement provide any support for the plaintiffs' *Revlon* claims.[58] Putting aside the lack of any motive for the board to negotiate preclusive lock-ups, the termination fee and no-shop contained in the XL merger agreement are not out of keeping with those which have been upheld by Delaware courts.

Although in purely percentage terms, the termination fee was at the high end of what our courts have approved, it was still within the range that is generally considered reasonable.[59] As important, the termination fee was structured so as to be payable only in the event that the Intercargo stockholders rejected the XL merger and were benefited by a more favorable strategic transaction within ninety days or another acquisition proposal within the ensuing year. This structure ensured that the Intercargo stockholders would not cast their vote in fear that a "no" vote alone would trigger the fee; the fee would be payable only if the stockholders were to get a better deal.[60] From the preclusion perspective, it is difficult to see how a 3.5% fee would have deterred a rival bidder who wished to pay materially more for Inter-

55. The board's reliance upon an investment banker (whose independence and qualifications are not challenged in the complaint) is another factor weighing against the plaintiffs' ability to state an actionable claim that the defendant directors breached their fiduciary duties by failing to secure the highest value reasonably attainable. *Goodwin,* mem. op. at 45, 1999 WL 64265, at *22, 1999 Del. Ch. LEXIS, at *68; *In re Vitalink,* mem. op. at 25–26, 1991 WL 238816, at *11–*12, 1991 Del. Ch. LEXIS 195, at *34–*35, Chandler, V.C. (Nov. 8, 1992), *aff'd without op. sub nom., Grimes v. McCarthy Profit Sharing Plan,* Del. Supr., 610 A.2d 725 (1992); 8 *Del. C.* § 141(e).

56. In the absence of the exculpatory charter provision, the plaintiffs would still have been required to plead facts supporting an inference of gross negligence in order to state a damages claim. Second-guessing about whether a board's strategy was "reasonable" or "appropriate" may be sufficient in a front-end injunction action under the *Revlon* standard, but it does little to assist a plaintiff in meeting its obligation to set forth facts from which one could infer that the defendants' lack of care was so egregious as to meet Delaware's onerous gross negligence standard. *See Kahn v. Roberts,* Del. Ch., C.A. No. 12324, mem. op. at 11, 1995 WL 745056, at *3, 1995 Del. Ch. LEXIS 151, at *11, Steele, V.C. (Dec. 6, 1995) (*quoting Tomczak v. Morton Thiokol, Inc.,* Del. Ch., C.A. No. 7861, mem. op. at 31–32, 1990 WL 42607, at *12,

1990 Del. Ch. LEXIS 47, at *35, Hartnett, V.C. (Apr. 5, 1990)), *aff'd,* Del.Supr., 679 A.2d 460 (1996).

57. *QVC,* 637 A.2d at 45 ("[A] court applying enhanced judicial scrutiny should be deciding whether the directors made *a reasonable* decision, not *a perfect* decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise.... [C]ourts ... will determine if the directors' decision was, on balance, within a range of reasonableness.").

58. For an excellent discussion of several important issues raised by the "deal protection" measures typically incorporated in merger agreements, *see* former Chancellor William T. Allen's article, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept,* 55 BUS. LAW. 653 (2000).

59. *Matador Capital Management Corp. v. BRC Holdings, Inc.,* Del. Ch., 729 A.2d 280, 292 n. 15 (1998); *Goodwin,* mem. op. at 46, 1999 WL 64265, at *23, 1999 Del. Ch. LEXIS 5, at *69.

60. Theoretically, the fee could be payable if the stockholders rejected the XL deal and a less favorable sales transaction was thereafter concluded. The probability of this occurring seems relatively small.

cargo. No doubt the presence of the fee would rebuff a bidder who wished to top XL's bid by a relatively insignificant amount that would not have been substantially more beneficial to Intercargo's stockholders, but to call such an insubstantial obstacle "draconian" is inconsistent with the very definition of the term.[61]

Likewise, the fact that the merger agreement contained a rather standard no-shop provision does little to bolster the plaintiffs' claim. The no-shop permitted the Intercargo board to consider an unsolicited proposal that the board determined was likely to be consummated and more favorable to Intercargo's stockholders than the XL merger. The presence of this type of provision in a merger agreement is hardly indicative of a *Revlon* (or *Unocal* [62]) breach.[63]

Finally, it is important to reiterate what this case does not involve. There is no allegation that the Intercargo board rushed into XL's arms in order to protect itself from another, more threatening bidder. There is no allegation that the Intercargo board refused to consider a higher bid [64] or that the provisions of the merger agreement prevented such a bidder from presenting a superior offer during the five months between the announcement of the XL merger and its consummation.[65]

**61.** *Unitrin*, 651 A.2d at 1383 n. 34 (discussing origins of the word and its association with "barbarous severity" and "cruelty"). Of course, an allegation that the 3.5% termination fee was slightly outside the range of reasonableness would, absent well-pled allegations of disloyalty, raise at most a very weak due care claim and, more probably, no viable claim at all under the relevant gross negligence standard.

**62.** Under a "duck" approach to the law, "deal protection" terms self-evidently designed to deter and make more expensive alternative transactions would be considered defensive and reviewed under the *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985) standard. The word "protect" bears a close relationship to the word "from." Provisions of this obviously defensive nature (e.g., no-shops, no-talks, termination fees triggered by the consummation of an alternative transaction, and stock options with the primary purpose of destroying pooling treatment for other bidders) primarily "protect" the deal and the parties thereto *from* the possibility that a rival transaction will displace the deal. Such deal protection provisions accomplish this purpose by making it more difficult and more expensive to consummate a competing transaction and by providing compensation to the odd company out if such an alternative deal nonetheless occurs. Of course, the mere fact that the court calls a "duck" a "duck" does not mean that such defensive provisions will not be upheld so long as they are not draconian.

**63.** *Matador*, 729 A.2d at 291 ("Contrary to plaintiffs' suggestion, these measures [in particular, a no-shop provision] do not foreclose other offers, but operate merely to afford some protection to prevent disruption of the Agreement by proposals from third parties that are neither bona fide nor likely to result in a higher transaction."); *Ace Ltd. v. Capital Re Corp.*, Del. Ch., 747 A.2d 95, 106 (1999) (a no-shop prohibiting a board of directors from "play[ing] footsie with other potential bidders or . . . stir[ring] up an auction . . . is perfectly understandable, if not necessary, if good faith business transactions are to be encouraged"); *In re Lukens*, 757 A.2d at 725 (dismissing *Revlon* claim in case where the merger agreement contained a " 'no solicitation clause' . . . preventing the . . . board from soliciting a competing takeover offer" where that clause "was connected to the customary 'fiduciary out,' allowing the board to adequately inform itself and take action on any unsolicited 'superior proposal' from a third party").

**64.** Again, solely for the sake of fairness to the defendant directors, I note that the proxy statement indicates that the Intercargo board in fact followed up on an expression of interest by another potential buyer in October 1998 who initially bandied about a price of $13.25 a share and then, after receiving due diligence information, talked about a $12.75 a share offer. Proxy Statement, at 10. Alas, this expression of interest never resulted in a fully financed, binding offer.

**65.** *E.g., Barkan*, 567 A.2d at 1287 ("when it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed"); *Goodwin*, mem. op. at 43–44, 1999 WL 64265, at *22, 1999 Del. Ch. LEXIS 5, at *66 (when superior bid did not emerge after a lengthy period during which the company's

In contrast to the usual *Revlon/Unocal* case involving defendants who have resisted a sale, this complaint attempts to state a claim against a board with a disinterested majority that engaged an investment banker to search for strategic buyers, that consummated a merger agreement with a third-party purchaser, and that put up no insuperable barriers to a better deal.

For all these reasons, the allegations of the complaint fail to state a claim that the defendant directors breached their so-called *Revlon* duties as a result of bad faith, self-interest, or any other reason that would suggest a breach of the duty of loyalty. As a result, the plaintiffs' breach of fiduciary duty claim, which is premised on *Revlon*, shall be dismissed.

E.  *The Complaint Fails To State A Claim That The Defendant Directors Knowingly And In Bad Faith Failed To Disclose Material Information*

■■■ Having reviewed the allegations of the complaint in connection with the plain-

tiffs' *Revlon* claim, there is no need for an exhaustive reexamination of its failure to plead facts suggesting that the defendants purposely concealed material information from the Intercargo stockholders. Although the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a "bad faith and knowing manner," no facts pled in the complaint buttress that accusation.[66] Thus, even if the complaint states a claim that there were material omissions from the proxy statement, it does not allege facts from which one can reasonably infer that any such omission resulted from more than a mistake about what should have been disclosed. As a result, the plaintiffs' disclosure claims shall be dismissed.[67]

---

willingness to engage in a strategic transaction was known, this factor weighed against finding a *Revlon* breach); *In re Vitalink*, mem. op. 22–23, 1991 WL 238816, at *10, 1991 Del. Ch. LEXIS 195, at *31 (where 45 days passed between the announcement of a tender offer and closing without an inquiry from an interested bidder, this fact was supportive of a finding that the board had adequate information to determine that a deal was the best available).

In their brief, the plaintiffs admit that the defendant directors were "unaware" of the alleged interest of Swiss Re and Houston Casualty. Pls. Br. at 12. Thus any failure of the defendant directors not to talk to them could hardly have been intentional. Furthermore, the complaint fails to allege any connection between their failure to make an offer and the terms of the XL merger agreement. Nor does our law require merger agreements to contain only such "deal protection" measures as will not deter the timid or those potential acquirors unwilling to bear the costs that may result from the law's acknowledgment that parties to executory merger contracts have legitimate, although constrained, contract rights. As long as no-shop and termination fee provisions are non-preclusive, non-coercive, and otherwise within the boundaries of reason, Delaware law generally recognizes them as valid.

66.  The complaint does not even come close to alleging disclosure omissions or any other

conduct "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co., Inc. Shareholders Litig.*, Del. Ch., 542 A.2d 770, 780–81 (1988), *appeal refused*, Del.Supr., 540 A.2d 1088 (1988).

67.  *Arnold v. Society for Savings Bancorp.*, Del. Supr., 650 A.2d 1270, 1286–87 (1994) (to the extent that inadequate disclosures can be attributed to no more than breaches of the duty of care and an exculpatory charter provision is in place, damage claims premised on those disclosures are not cognizable); *Frank v. Arnelle*, Del. Ch., C.A. No. 15642, mem. op. at 27–30, 1998 WL 668649, at *8–*9, 1998 Del. Ch. LEXIS 176, at *37–*41, Chandler, C. (Sept. 16, 1998) (same), *aff'd*, 725 A.2d 441 (1999); *Goodwin*, mem. op. at 10–11 & 11 n. 3, 1999 WL 64265, at *5–*6 & *6 n. 3, 1999 Del. Ch. LEXIS 5, at *15–*17 & *16 n. 3 (same).

In this respect, I also note that Vice Chancellor Jacobs' well-reasoned preliminary injunction opinion ruling on plaintiffs' disclosure claims—which was decided on a record identical to that I am permitted to consider in ruling on plaintiffs' disclosure claims—supports dismissal of the those claims on the merits. In view of my approach to this case and Vice Chancellor Jacobs' thorough analysis and rejection of those claims, I need not

508

## Conclusion

For all the foregoing reasons, the defendants' motion for judgment on the pleadings is granted and the plaintiffs' amended complaint is dismissed with prejudice.[68] IT IS SO ORDERED.[69]

revisit his examination of the merits other than to indicate my agreement with his conclusion that the alleged omissions were not material. *See In re Wheelabrator,* mem. op. at 10, 1992 WL 212595, at *4, 1992 Del. Ch. LEXIS 196, at *17 (where record had not changed since the court decided that a disclosure claim was without merit on a motion for preliminary injunction, court relied on its prior analysis in dismissing the same claim on a 12(b)(6) motion); *Intercargo I,* mem. op. at 12–26, 1999 WL 288128, at *5–*10, 1999 Del. Ch. LEXIS 16963, at *15–*36 (examining plaintiffs' disclosure claims and concluding that none of the omitted information was material).

68. The complaint is also dismissed as against Intercargo itself. *NRG Barriers, Inc. v. Jelin,* Del. Ch., C.A. No. 15013, let. op. at 12–13, 1996 WL 451319, at *6, 1996 Del. Ch. LEXIS 99, at *17–*18, Steele, V.C. (Aug. 6, 1996).

69. The plaintiffs have not suggested that they would like to further amend their amended complaint and therefore I deem a "with prejudice" dismissal to be appropriate.