Fabricant, Judith, J.
This action arises from the termination of the business of ion Health Holdings, Inc. (“Holdings”). Plaintiff Anthony Horbal (“Horbal”), minority shareholder of Holdings, claims that its majority shareholder, J.W. Childs Equity Partners III, L.P. (“Childs”), and three individuals Childs designated to serve as directors, Michael N. Cannizzaro, Mark J. Tricolli and Edward D. Yun, breached fiduciary duties to the plaintiff and to Holdings. Now before the Court is the defendants’ motion to dismiss Horbal’s third amended complaint. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
Horbal’s third amended verified complaint runs 41 pages, with 136 paragraphs. Unfortunately, volume does not correspond to substance. The following summarizes the factual allegations of the complaint that bear on the claims asserted.
Investing some $14 million, Horbal founded Holdings in February 2004, as a Delaware Corporation, to act as a holding company for subsidiaries that would operate Medicaid and Medicare managed healthcare plans in multiple states. Holdings had subsidiaries in Pennsylvania, Ohio and Michigan, known respectively as ion Health, Inc. (“Ion”), ion Health of Ohio, Inc. (“Ohio”), and ion Health of Michigan, Inc. (“Michigan”). Ion succeeded in obtaining a contract from the Commonwealth of Pennsylvania, and began enrolling members in April of 2004. Ohio and Michigan never reached that stage; the closest either came was negotiation in the fall of 2004 to acquire an entity that held a license to operate a managed care plan in Ohio.
As of 2004, according to the complaint, Holdings had neither cash flow nor earnings. Horbal sought a financial partner for Holdings, and identified Childs, a Delaware limited partnership controlled by J.W. Childs Associates, L.P. (“JWC”), a private equity firm. On August 6, 2004, Holdings and Childs entered into a letter of intent, which provided that Childs would make an initial investment of $20 million, and additional investments, referred to as “the Equity Commitment,” for a total of $200 million. Press releases touted the funding commitment.
On November 15, 2004, the parties executed a Series A Preferred Stock Purchase Agreement (“SPA”), pursuant to which Childs invested $20 million, and received a 51% share in Holdings. The SPA included the following provision regarding additional investment by Childs:
1.5 Additional Purchase Commitment. Following the Closing, J.W. Childs Equity Partners III, L.P. (“J.W. Childs Equity Partners”) commits to provide, or cause to be provided, to the Company $180,000,000 in additional funding to enable the Company to achieve its strategic objectives in accordance with and subject to the following terms and conditions:
(4) On the Triggering Event, J.W. Childs Equity Partners shall purchase, or cause one of its Affiliates to purchase the number of additional shares of Series A Preferred Stock for an aggregate purchase price as set forth in the Triggering Event Notice; provided, that the obligations to purchase Series A Preferred Stock is subject to (i) the consent of J.W. Childs Equity Partners which may be withheldfor any reason, or for no reason.
(Emphasis added.) Childs designated the three individual defendants to serve as directors of Holdings. Each of them was a partner in, employed by, or otherwise affiliated with Childs or its affiliates. Horbal *389 and one Nelson were also directors. The directors appointed Horbal as Chief Executive Officer, and Nelson as President.
As of the spring of 2005, Ion had increased enrollment in its Medicaid managed health plan, and had obtained regulatory approval to enter the Medicare market. Ohio had acquired a shell company that held an Ohio Medicaid license, and had met with Ohio Medicare managed healthcare plans it identified as potential acquisition candidates. Holdings had also negotiated to purchase a Medicaid managed care plan in Michigan. Holdings and its subsidiaries had not, however, reached a “breakeven” point, and had not resolved what the complaint describes as “start up issues common to any new health plan,” including “lack of management depth” and difficulties with “medical loss ratio.”
On June 6, 2005, the director defendants terminated Horbal and Nelson as CEO and President of Holdings, and installed Cannizzaro as interim CEO. On June 24, 2005, Cannizzaro advised the directors to consider “strategic alternatives” for the business, including a sale of Holdings or its assets. Although Ion’s president provided encouraging projections, on June 27, 2005, the directors authorized Cannizzaro to surrender the Ohio license, reduce personnel, and sell the assets of Holdings and its subsidiaries.
Horbal offered to buy the stock of Ohio for $1.7 million, the amount of the deposit the company had been required to post with the State of Ohio, which would have been returned upon surrender of the license. On July 11, 2005, the defendants agreed to the accept the offer on specified conditions, including a release of liability. Horbal agreed to the other conditions, but refused the release. On July 20, 2005, defendants made the regulatory filings necessary to terminate Ohio’s operations and surrender its license, triggering return of the $1.7 million deposit.
Childs enlisted investment banker Cain Brothers, Inc., to assist it in selling Holdings. Childs undermined the sales effort, according to the complaint, by setting a closing deadline of December 31, 2005; by excluding favorable projections from information provided to potential buyers; and by conveying negative evaluations to potential buyers. No sale occurred.
On August 31, 2005, Childs engaged healthcare consultant Schaller Anderson, Inc., to assess Ion’s operational and financial viability. Between September 30 and October 15, 2005, Schaller Anderson provided a series of increasingly pessimistic projections; the first forecast results for 2006 ranging from a loss of $2.6 million to a profit of $3.2 million, while the last forecast a loss of $9.2 million. On December 2, 2005, the directors voted not to renew the Pennsylvania Medicaid contract, and to proceed with winding down Holdings. Ion announced the cessation of its business on December 12, 2005.
The complaint offers a theory to explain this sequence of events: Childs, despite its investment of $20 million mere months earlier, “[a]t some point in the late first quarter or early second quarter of 2005" ’’surreptitiously" decided, for reasons not identified, to divest itself of its investment in Holdings. It “had a problem,” however: “its perceived common law and contractual funding commitment to Holdings,” breach of which, it believed, “would likely result in a lawsuit and/or a reputation as a fund that does not honor its commitments.” To avoid those consequences, it pursued a scheme to destroy the company — that is, to “wind-up the business and render it inoperable by anyone else.” In furtherance of that scheme, Childs and the individuals it placed on Holdings’s board: disregarded and hid positive information about Holdings’s accomplishments and prospects; made unrealistic demands on management; “feigned panic” at negative information of which they had been aware all along; terminated Horbal and Nelson despite their value for the business; failed to hire executives and discouraged the one candidate interviewed for chief financial officer; imposed unreasonable conditions on Horbal’s offer to purchase; provided disorganized information to and withheld positive information from prospective buyers; and manipulated Schaller Anderson’s assessment so as to obtain a desired “gloomy forecast.”
Horbal filed his original complaint in this action on October 21,2005, while Holdings was still in business. The substance of his claim at that time was that Childs had breached its obligations under the SPA by refusing to make additional investments in Holdings. Defendants moved to dismiss, in response to which Horbal filed his first and second amended complaints in March and July of 2006. Defendants again moved to dismiss, contending that the SPA imposed no duty on Childs to make any additional investment, since by its terms it granted J.W. Childs Equity Partners complete discretion to withhold consent for any such further investment “for any reason or for no reason." In a decision issued December 3, 2007, the Court (van Gestel, J.), agreed, and dismissed the three contract-based counts of the complaint [23 Mass. L. Rptr. 380]. The Court declined, however, to dismiss the counts alleging breach of fiduciary duly and civil conspiracy, applying the indulgent standard then applicable to motions to dismiss. Discovery proceeded on those two claims.
In June of2008, the Supreme Judicial Court issued its decision in Iannachino v. Ford Motor Co., 451 Mass. 623 (2008), adopting the more stringent standard for motions to dismiss established by the United States Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Citing the new standard, defendants moved for reconsideration of the denial of their motion to dismiss the two remaining claims. Judge van Gestel having retired, this Court indicated that it would treat *390 that motion as one for judgment on the pleadings, and set a schedule for briefing. The parties then agreed to attempt mediation, and the Court extended the schedule. When the mediation effort failed, Horbal filed his Third Amended and Verified Complaint. This version asserts three counts: breach of fiduciary duty against all defendants (count one);[3] aiding and abetting breach of fiduciary duiy, against Childs (count two); and civil conspiracy (count three). Defendants’ motion to dismiss challenges all three counts.
DISCUSSION
A motion to dismiss “argues that the complaint fails to state a claim upon which relief can be granted.” Jarosz v. Palmer, 436 Mass. 526, 529 (2002), quoting J.W. Smith & H.B. Zobel, Rules Practice §12.16 (1974). In considering such a motion, the court takes as true the well-pleaded factual allegations of the complaint, as well as such inferences as may be drawn from them in favor of the non-moving party, Nader v. Citron, 372 Mass. 96, 98 (1977), but disregards legal conclusions cast in the form of factual allegations. Schaer v. Brandeis University, 432 Mass. 474, 477 (2000). To survive a motion to dismiss under current law, the complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief,” and “must be enough to raise a right to relief above the speculative level.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atlantic Corp. v. Twombly, 550 U. S. at 555.
Under Delaware law,[4] directors have “an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders.” Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993). A company may, however, immunize its directors from claims of breach of fiduciary duty, except claims alleging breach of the duty of loyalty, bad faith, or intentional misconduct or knowing violation of law. See 8 Del.C. §102(b)(7). Holdings did so, including in its charter immunity to the extent permitted by law. Thus, to state a claim against the individual defendants for breach of their fiduciary duties as directors of Holdings, Horbal would have to allege facts indicating that they acted disloyally or in bad faith. See In re Lear Corp. Shareholder Litig., 967 A.2d 640, 641, 648, 652 (Del.Ch. 2008).
In considering a claim against directors of breach of the duty of loyalty, courts apply the business judgment rule, which “is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in best interest of the company.” Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) (citing 8 Del.C. §141 (a)); see Cede & Co., 634 A.2d at 360. To rebut the presumption of good faith, a plaintiff must plead facts indicating that a director was on “both side[s] of a transaction” such that he stood to “derive [a] personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all shareholders generally.” Aronson, supra; see Orman v. Cullman, 794 A.2d 5, 23 (Del.Ch. 2002). Alternatively, the plaintiff may rebut the presumption by showing that the defendant intentionally acted in bad faith, “with a purpose other than that of advancing the best interest of the corporation, . . . with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act.” Stone v. Ritter, 911 A.2d 362, 369 (Del. 2006); citing In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 67 (Del. 2006).
The interests of a majority shareholder are presumed to be aligned with those of the company, due to the shareholder’s “powerful economic (and psychological) incentives” to maximize value for all shareholders. In re Transkaryotic Therapies, Inc., 954 A.2d 346, 366 (Del.Ch. 2008) (internal quotations omitted), and cases cited. To maintain a claim for breach of the fiduciary duiy against a controlling shareholder, a minority shareholder must allege facts indicating that the controlling shareholder acted to benefit itself to the detriment of the minority shareholders. See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A., 137 F.Sup.2d 502, 515 (S.D.N.Y. 2001) (applying Delaware law). See also McMillan v. Intercargo Corp., 768 A.2d 492, 504 (Del.Ch. 2000) (“The normal presumption is that the owner of a substantial block who decides to sell is interested in obtaining the highest price”); McGowan v. Ferro, 859 A.2d 1012, 1035 (Del.Ch. 2004), aff'd, 873 A.2d 1099 (Del. 2005) (“Absent a strong factual showing . . . the Court cannot reasonably infer that directors with very substantial stock holdings would fail to seek the highest value reasonably available”); In re House of Lloyd, Sales LLC, 2008 WL 957663 *24-25 (Bkrtcy.W.D.Mo.) (directors’ affiliation with shareholder does not undermine independence where shareholder had no interest in conflict with the corporation). Thus, to show that a director is affected by a conflict of interest based on the director’s relationship with the majority shareholder, a plaintiff must show that the majority shareholder itself was on both sides of a transaction with the corporation.
Here, the facts alleged include nothing whatever to indicate that any of the defendants engaged in any self-dealing, or had any other monetary interest that was not shared by the stockholders generally. Compare Venhill Ltd. P’ship v. Hillman, 2008 WL 2270488, at *20 (Del.Ch. June 3, 2008) (presumption rebutted where defendant was general partner of plaintiff and chairman, CEO, and president of its transaction partner); Nagy v. Bistricer, 770 A.2d 43, 46 (Del.Ch. 2000) (presumption rebutted where defendants were directors and controlling shareholders of both companies for which they negotiated merger agreement); Strassburger v. Earley, 752 A.2d 557, 571 (Del.Ch. 2000) (presumption rebutted where shareholder/director negotiated transaction in which he acquired *391 additional interest); In re Robotic Systems, Inc., 374 B.R. 36, 50-51 (Bkrtcy.D.N.H. 2007) (allegations that internal director acted to preserve his management position and to obtain security interest in company’s assets sufficed to state claim). Horbal points out that the three individual defendants were controlled by Childs, but he has not identified any economic interest of Childs that was contrary to the interests of the corporation. To the contrary, the complaint acknowledges that Childs had invested $20 million, which it stood to lose upon the failure of Holdings. Without a conflicting interest on the part of Childs, whatever dependence the individual dependence may have had on it is no indication of breach on their part.
Lacking any basis to allege a conflict of economic interest, Horbal relies on his theory that, having decided, for unidentified reasons, to divest itself of its interest in Holdings, Childs set about to destroy it. Childs’s motivation for thus sacrificing its $20 million investment, according to Horbal’s theory, was to protect its reputation from anticipated impairment based on perceived breach of what it believed to be a contractual obligation to make additional investments in Holdings.
Even assuming that the law would recognize an interest in reputation, without economic conflict, as sufficient to rebut the presumption of good faith, Horbal’s theory suffers from defects at each step. First, the Court has already ruled, based on the plain and unequivocal language of the SPA, that Childs had no obligation to make any additional investment in Horbal. The allegation that Childs believed it had such obligation, despite the clear contract language, is, in the language of Trombley, implausible. Second, Horbal offers no theory to explain how the complete failure of Holdings would somehow enhance or preserve Childs’s reputation; the opposite effect would seem far more likely.
Horbal relies heavily on the substance of the decisions made with which he disagrees, describing them in such a manner as to suggest that they were so obviously contrary to the interest of the corporation as to indicate bad faith. A breach of fiduciary duty, however, “can never be appropriately be judicially determined by reference to the content of the board decision.” Walt Disney, 907 A.2d at 750 (emphasis in original), quoting In re Caremark Int’l Inc. Derivative Litig., 698 A.2d 959, 967-68 (Del.Ch. 1996). To the contrary, the function of the business judgment rule is to protect directors from claims based on just such reasoning.
Horbal has not alleged facts indicating a plausible basis to find that the defendants were affected by any interest in conflict with those of Holdings. Without such a conflict, the defendants retain the presumption of good faith, which precludes judicial review of their business decisions. The breach of fiduciary duty count therefore fails to state a claim on which relief can be granted. The other counts, claiming aiding and abetting, both rest on that claimed breach of fiduciary duty, and fall with it. See Manzo v. Rite Aid Corp., 2003 WL 31926606, at *6 (Del.Ch. Dec. 19, 2002) (dismissing claim for aiding and abetting because the underlying fiduciary duty claim was dismissed), aff'd, 825 A.2d 239 (Del. 2003); McLaughlin v. Copeland, 455 F.Sup. 749, 752-53 (D.Del. 1978) (“it is well settled that ‘(n)o action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort’ ”), aff'd, 595 F.2d 1213 (3d Cir. 1978); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 596-97 (1986) (if alleged co-conspirators “had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy”).
CONCLUSION AND ORDER
For the reasons stated, Defendants’ Motion to Dismiss the Plaintiff s Third Amended Complaint is ALLOWED.[5]

The complaint identifies the fiduciary duty of the individual defendants as that imposed on them as directors.

The parties agree that this matter is governed by Delaware law.

The Court declines to provide Horbal an opportunity to further amend, after four years of litigation and four attempts at pleading a cognizable claim.