COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: May 30, 2024
Date Submitted: February 13, 2024

Brian M. Rostocki, Esquire
John Miraglia, Esquire
Anne M. Steadman, Esquire
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801

Richard A. Forsten, Esquire
Pamela J. Scott, Esquire
Gary W. Lipkin, Esquire
Saul Ewing LLP
1201 N. Market Street, Suite 2300
Wilmington, DE 19801

Re: *Christiana Realty Associates, LLC v. Christiana Town Center, LLC*,
C.A. No. 2023-0799-SEM

Dear Counsel:

In this landlord-tenant action, the landlord compels me to embrace the simple. But its simple argument, persuasive as it may be, does not support judgment on the pleadings. For the reasons I will explain, I adopt the landlord's simple argument and find the primary lease provision at issue is not ambiguous, as written. Yet I find the tenant's claims should, nonetheless, survive the pleadings. Thus, I recommend the landlord's motion for judgment on the pleadings be denied.

This is my final report.

## I.     BACKGROUND

Through this action, Christiana Realty Associates, LLC (the "Tenant") and Christiana Town Center, LLC (the "Landlord," together, the "Parties") seek clarity

regarding the real estate taxes the Tenant is obligated to pay under the Parties' long-term lease. I begin with a brief background taken from the pleadings, which I weigh in a light most favorable to the non-moving party (the Tenant).[1]

## A. The Tax Obligations

The Parties' landlord-tenant relationship began in 2001. The Landlord owned and sought to develop a parcel of land which is now known as the Christiana Town Center.[2] Opting not to build and wait for a tenant to come,[3] the Landlord proactively contracted with the Tenant, who agreed to construct and operate a Boscov's department store on the property.[4]

On April 30, 2001, the Parties executed a ground lease setting forth the terms of their arrangement (the "Lease").[5] The Lease, at over 50 pages and with 26

---

[1] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) ("[A] trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.") (citation omitted).

[2] Docket Item ("D.I.") 4, ¶ 1. *See also* D.I. 4, Ex. A ("Lease"), p.1. I consider the exhibits to the Landlord's answer as incorporated into and integral to the pleadings. *Jiménez v. Palacios*, 250 A.3d 814, 827 (Del. Ch. 2019) ("On a Rule 12(c) motion, the Court may consider documents integral to the pleadings, including documents incorporated by reference and exhibits attached to the pleadings, and facts subject to judicial notice.") (citations omitted).

[3] *See* FIELD OF DREAMS (Universal Pictures 1989).

[4] D.I. 1, ¶¶ 1, 18.

[5] Lease, p.1.

sections (not including subsections and attachments), is extensive. I will not endeavor to summarize the multitude of agreed-upon exchanges evident therein, and rather limit myself to the relevant terms at issue: those related to real estate taxes, addressed primarily in Section 5.[6]

Section 5 clarifies each of the Parties' responsibilities regarding real estate taxes. Under Section 5.1, the Landlord is responsible for paying all "Real Estate Taxes," defined as:

> Any ad valorem taxes and assessments (irrespective of whether such tax or assessment and increases therein, are general or special, ordinary or extraordinary, foreseen or unforeseen), imposed or assessed and levied from time to time by any governmental, public or quasi-public body on any land or improvements constituting the Shopping Center or any part thereof.[7]

But the Tenant is not fully off the hook. Rather, the Parties set up a procedure through which the Tenant would reimburse the Landlord for a certain amount of the Real Estate Taxes. Under Section 5.2, the Parties devised how the Tenant's reimbursement should be calculated. It starts with the "Base Year," defined as: "The later of: (a) the first full year in which the Tenant's Building is fully constructed and

---

[6] Two other provisions are relevant to the matters pending before me: an anti-waiver clause and an integration clause. They are addressed in my analysis. The Landlord also seeks to invoke a fee-shifting provision, which I consider briefly below.

[7] Lease § 1.77. "Shopping Center" is defined as the buildings and improvements to be known as "Christiana Town Center." *Id.* at § 1.86; p.1 (Background).

fully assessed for Real Estate Tax purposes; or (b) the date Landlord obtains a separate tax assessment for the Demised Premises and the Tenant's Building alone."[8]

Per the Landlord, the Base Year was established in 2002.[9] The Landlord explained in its answer that the Demised Premises and the Tenant's building were assessed in December 2001, with the increased assessment effective for 2002.[10] The Tenant's position is unclear.[11]

Regardless of when the Base Year was established, the calculation under the Lease appears simple. Beginning with the first tax year after the Base Year, the Tenant was required, under Section 5.2, to "reimburse Landlord for the excess, if any, of: (a) the annual Real Estate Taxes separately assessed against Demised Premises and Tenant's Building alone; minus (b) the Real Estate Taxes separately assessed against Demised Premises and Tenant's Building alone during the Base

---

[8] Lease § 1.13. "Demised Premises" is "[t]he Devised Land, including the air space above, and the subsurface below, the Demised Land, and all Appurtenances." Lease § 1.29. "Demised Land" is defined in the background section of the Lease as the portion of the shopping center to be leased. "Appurtenances" are "[a]ny rights, licenses, privileges, easements and appurtenances . . . used in connection with or belonging or pertaining to the Demised Land or the portion of the Shopping Center Property of which the Demised Land is part." Lease § 1.11.

[9] D.I. 4, p.8.

[10] *Id.*

[11] *Id.*

Year."[12]  The Tenant was required to pay this excess "within thirty (30) days after Tenant is provided with an invoice in sufficient detail showing the aforesaid computation and receipted copies of the Real Estate Tax bills for the Demised Premises and Tenant's Building."[13]

For nearly two decades, the Parties worked through tax liability without incident.  Each year, until 2022, the Landlord sought reimbursement from the Tenant and the Tenant paid the requested amount.  In calculating the reimbursement, the Landlord, until 2022, sought from the Tenant the year-over-year difference; meaning the Landlord calculated the excess from the last tax year, rather than reaching back each year to the Base Year.

### B.    The Extension

The Lease had an initial term of 20 years.[14] But the Tenant also had the option to extend the Lease six times, each for a period of five additional years.[15]  On or around November 6, 2020, the Tenant provided written notice that it was exercising

---

[12] Lease § 5.2.

[13] *Id.*

[14] Lease § 3.1.

[15] Lease § 3.2.

its first option to extend the Lease.[16]  The extended term commenced November 31, 2021, and runs for a five-year period (the "Extended Term").

This controversy arose during the Extended Term.  On November 4, 2022, the Landlord sent the Tenant a spreadsheet purporting to show "the shortfall" in the requested reimbursement from 2003 through 2022 (the "Spreadsheet").[17]  The Spreadsheet confirmed that the Landlord had been requesting reimbursement based on a year-over-year calculation, rather than a look back to the Base Year.[18]  Altogether, the Landlord calculated it had underbilled by over $1.4 million.[19]

Through a February 17, 2023 email, the Landlord conceded that it could only collect on the last three years due to "the Delaware statute of limitations for collection of a debt[.]"[20]  The collectable amount, per the Landlord, was $508,188.44 owed for 2019 to 2022.[21]  The Tenant did not, as requested by the Landlord, "promptly pay" that amount; thus, on or around July 11, 2023, the Landlord sent the

---

[16] D.I. 4, ¶ 33.

[17] D.I. 4, Ex. G.

[18] *Id.*

[19] *Id.*

[20] D.I. 4, Ex. H.

[21] *Id.*

Tenant a "Notice of Default" under Section 20.1.1 of the Lease.[22] The Tenant responded to the Notice of Default on August 8, 2023, disputing that it was in default, but making a "Protest Payment" of $287,024.81.[23]

## C. Procedural Posture

The Protest Payment was made one day after the Tenant commenced this action. On August 7, 2023, the Tenant filed the underlying complaint seeking: (1) declaratory judgment that the Tenant does not owe the Landlord any additional payments under Section 5.2 and that the Tenant has not defaulted ("Count I"); (2) alternatively, reformation of Section 5.2 to match the Parties' purported understanding and agreement to the year-over-year calculations used by the Landlord until 2022 ("Count II"); (3) alternatively, amendment of Section 5.2 to match the Parties' course of performance ("Count III"); and (4) declaratory judgment that the Landlord is time-barred from bringing a claim for allegedly underpaid reimbursement from 2019 or earlier ("Count IV") (altogether, the "Complaint").[24]

---

[22] D.I. 4, Ex. B.

[23] D.I. 4, Ex. C.

[24] D.I. 1.

On August 17, 2023, the Landlord answered the Complaint and asserted counterclaims.[25] The Landlord counters that the Tenant is liable for breach of contract, for failing to pay the reimbursement requested, and that the Court should issue a declaratory judgment regarding the meaning of Section 5.2 (the "Counterclaims"). On September 6, 2023, the Tenant answered the Counterclaims, closing the pleadings.[26]

The Landlord then moved for judgment on the pleadings on November 1, 2023 (the "Motion").[27] The Motion was fully briefed and argued on February 13, 2024, at which time I took it under advisement.[28]

## II. ANALYSIS

The Motion was filed under Court of Chancery Rule 12(c). "This court will grant a motion for judgment on the pleadings under Court of Chancery Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law."[29] When considering the Motion, I must assume the truthfulness of

---

[25] D.I. 4.

[26] D.I. 5.

[27] D.I. 8.

[28] *See* D.I. 10, 12, 14–15. I permitted the Landlord to respond, after oral argument, to new authority proposed by the Tenant, which the Landlord did via letter submission on February 15, 2024. D.I. 16.

[29] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 499 (Del. Ch. 2000) (citation omitted).

the Tenant's well-pled allegations of fact and draw all reasonable inferences in the Tenant's favor.[30] Like a motion under Court of Chancery 12(b)(6), I need not, however, blindly accept all allegations nor draw unreasonable inferences.[31]

The Landlord contends the Lease is unambiguous, the Tenant's claims are unsupported, and the Landlord should, thus, prevail at the pleading stage. To some extent, I agree. Section 5.2, as written, is unambiguous. But the Complaint and the Tenant's claims and requests for relief therein, are not so narrow. As explained above, the Tenant pled four counts. The Landlord's lack-of-ambiguity argument, at most, would support dismissal of one part of Count I. Regarding Counts II and III, the Landlord argues that relief is barred by other provisions in the Lease; I disagree and find those claims turn on disputed facts. And, finally, the Landlord concedes the argument underlying Count IV. Thus, and as further explained below, I find the Complaint should survive and the Motion should be denied.

I address each count in turn and include therein my discussion of the relevant portions of the Counterclaims; I then turn to the Landlord's request for fee shifting.

---

[30] *Id.*

[31] *Id.*

**A.     Although one legal theory fails, Count I remains viable.**

Through Count I, the Tenant seeks declaratory judgment that it does not owe the Landlord any additional payments under Section 5.2 and that it has not defaulted under the Lease.   The Tenant states three bases for the relief requested: (1) that Section 5.2 is ambiguous, (2) that the doctrine of equitable estoppel bars the Landlord from asserting its current position, and (3) that the doctrine of acquiescence bars the Landlord from recovering additional amounts. I agree with the Landlord that (1) should fail, but (2) and (3) do not rise and fall with ambiguity. More importantly, though, I herein follow my colleagues' lead in declining to prune legal theories from an otherwise viable count at the pleading stage. Thus, I decline to recommend judgment in the Landlord's favor on Count I.

**1.     Section 5.2 is not ambiguous.**

Delaware's contract interpretation principles are settled.

> When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language. Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. If a contract is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent. Stated differently, clear and unambiguous language is reasonably susceptible of *only one* interpretation. Language

from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.[32]

On the other hand, a contractual provision is ambiguous "when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[33] "If the words of the agreement can only be known through an appreciation of the context and circumstances in which they were used at the time of drafting, then the language is ambiguous, such that a court is not free to disregard extrinsic evidence of what the parties intended."[34]

Section 5.2 is unambiguous. The language is clear and susceptible to only one interpretation: that the excess is calculated by using the Base Year as the floor. Stated another way, Section 5.2 sets up a procedure whereby the Tenant is to pay the difference between the new taxes and the taxes paid for the Base Year. The words used within Section 5.2 are not susceptible to any contrary interpretation, let alone the Tenant's favored interpretation of the year-over-year calculation. Nor does the

---

[32] *BitGo Hldgs., Inc. v. Galaxy Digit. Hldgs., Ltd.*, 2024 WL 2313115, at *8 (Del. May 22, 2024) (citations and quotations omitted; emphasis in original).

[33] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. Super. 1973)).

[34] *BitGo Hldgs., Inc.*, 2024 WL 2313115, at *8 (citations omitted; cleaned up).

Lease, as whole, cast any doubt on the meaning of Section 5.2 or how it is meant to operate.

In so holding, I reject the Tenant's call toward the Landlord's historical calculations. With unambiguous language, it would be inappropriate to turn to such extrinsic evidence. I cannot "consider extrinsic evidence unless [I] find that the text is ambiguous."[35] I find the opposite. And under Delaware's contract interpretation principles, "extrinsic evidence may not to be used to create an ambiguity."[36] Thus, I decline the Tenant's invitation.

Section 5.2, as written, is not ambiguous and has the meaning expressed above. To the extent the Tenant seeks declaratory judgment of ambiguity, such relief

---

[35] *Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714, 721 (Del. 2022).

[36] *BitGo Hldgs., Inc.*, 2024 WL 2313115, at *8 (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) (cleaned up). During oral argument, the Tenant pointed me to *Ashland LLC v. Heyman*, 2020 WL 1231100 (Del. Super. Feb. 25, 2020) *rev'd*, 284 A.3d 714 (Del. 2022) and *Fox v. Paine*, 2009 WL 147813 (Del. Ch. Jan. 22, 2009) *aff'd*, 981 A.2d 1172 (Del. 2009), to argue that I can—and should—consider extrinsic evidence to confirm that Section 5.2 reflects the Parties' intent. But *Ashland* was reversed and remanded by the Delaware Supreme Court, which emphasized: "We do not consider extrinsic evidence unless we find that the text is ambiguous." *Heyman*, 284 A.3d at 721. Such may have implicitly overruled this Court's permissive consultation in *Fox*, on which the Superior Court in *Ashland* heavily relied. *See Ashland LLC*, 2020 WL 1231100, at *11 (citing *Fox*, 2009 WL 147813, at *5). But, even if the consultation language in *Fox* remains good law, *Fox* merely permits consultation of undisputed background facts. *Fox*, 2009 WL 147813, at *5. Here, the Parties' knowledge and intent, both pre- and post-signing, is disputed; it would thus be inappropriate to consider or consult their conduct to interpret the otherwise unambiguous Section 5.2.

is unavailable. But, as discussed below, more remains within Count I and whether Section 5.2 adequately captures the Parties' agreement or was amended by the Parties' course of conduct, remains to be seen.

### 2.     Count I should, nonetheless, survive.

Stepping back, through Count I, the Tenant seeks a declaratory judgment that it does not owe the Landlord any additional payments under Section 5.2 and that the Tenant has not defaulted on the Lease.

> Where a plaintiff seeks to have the Court consider a claim for declaratory judgment, that plaintiff must sufficiently allege that: (1) the dispute "involves a claim of right or other legal interest of the party seeking declaratory relief;" (2) the party against whom the claim is asserted "has an interest in contesting the claim;" (3) the parties' "conflicting interests are real and adverse; and (4) the issue is ripe for judicial determination."[37]

Particularly when viewed in context of my rulings below, the Tenant (like the Landlord) has a viable claim for declaratory judgment and the Landlord is not entitled to judgment as a matter of law at this stage. The Parties dispute the Tenant's rent obligations under the Lease, both sides have an interest in contesting those obligations, their interests are real and adverse, and the issue is ripe for judicial

---

[37] *Sykes v. Touchstream Techs., Inc.*, 2024 WL 1299928, at *6 (Del. Ch. Mar. 27, 2024).

determination.  I see no reason to further prune Count I by delving into the Tenant's

alternate legal theories.[38]

### B.  Count II and III are not contractually barred and should survive the pleadings.

The Landlord argues it is entitled to judgment on Counts II and III because

the Tenant's reformation request and amendment argument are barred by the

integration and anti-waiver provisions in the Lease.  I disagree.

The integration clause and anti-waiver clauses provide, in turn:

---

[38] *See Urvan v. AMMO, Inc.*, 2024 WL 863688, at *11 (Del. Ch. Feb. 27, 2024) (finding one legal theory "enough to get [a] unified count through the pleading stage") (first citing *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4–6 (Del. Super. Jan. 26, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."); and then citing *Envolve Pharm. Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 855866, at *4 n.45 (Del. Super. Mar. 8, 2021) ("[I]t is not generally the Court's duty to dissect a single claim for either dismissal or rescue of its constituent theories of liability.")). *See also* Ct. Ch. R. 8(e)(2) ("When 2 or more statements are made in the alternative and 1 of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of 1 or more of the alternative statements.").

The Landlord argues that the Tenant failed to plead a claim for equitable estoppel with the requisite particularity. But the Motion is not for dismissal for failure to state a claim under Rule 12(b)(6), it is for judgment on the pleadings under Rule 12(c). Although the standards are similar, Rule 12(c) looks not just to viability but also to whether the factual record is disputed. *Cf. Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *4 (Del. Ch. Nov. 5, 2001) ("Because I find that no factual issue exists to prevent rendering a judgment on the pleadings, the standards for motions under both Rule 12(b)(6) and Rule 12(c) are almost identical[.]").  Here, material facts underlying equitable estoppel are in dispute and preclude judgment on the pleadings.

- "This Lease contains the entire agreement between Landlord and Tenant and cannot be amended or modified except by written instrument executed by both parties hereto." [39] The "Integration Clause."

- "The waiver by Landlord or Tenant of any breach of any provision of the Lease or the failure by Landlord or Tenant to insist upon the strict observance of any provision shall not be deemed to be a waiver of any subsequent breach thereof."[40] The "Anti-Waiver Clause."

I find that these clauses do not, as a matter of law, bar Counts II and III. Without these bars, I must consider the viability of Counts II and III, which turns on numerous disputes of material fact. Judgment cannot be entered on the pleadings.

### 1. The Integration Clause does not bar Count II or III.

The Integration Clause is not nearly as powerful a backstop as the Landlord contends. "Under blackletter law, a binding and completely integrated agreement 'discharges prior agreements to the extent that they are within its scope.'"[41] Further, Delaware has, through a long line of cases, enforced clear anti-reliance provisions

---

[39] Lease § 24.10.

[40] Lease § 24.4.

[41] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 822 (Del. Ch. 2020) (citation omitted).

to preclude mistake arguments and resulting requests for reformation.[42] But, the integration clause must support that preclusion.

Vice Chancellor Zurn addressed this nuance in *Sanyo Elec. Co. v. Intel Corp.*[43] Therein, the Vice Chancellor faced a similar argument (albeit on summary judgment) that an integration clause precluded a reformation request. The clause before her went further than the one here; it expressly provided that the parties shall not be bound by representations not contained in the underlying agreement and that no oral information should alter the interpretation of the agreement. Still, the Vice Chancellor found the clause lacked the anti-reliance language necessary to foreclose a request for reformation. She explained:

> While "Delaware law does not require magic words," the relevant clauses of [the integration clause], taken together or standing alone, do not amount to clear anti-reliance language that forecloses [the plaintiff] from seeking reformation. [The clause] does not include any clear or express statement that [the plaintiff] has contractually promised that it did not rely upon statements outside the [contract's] four corners. Nor does [the clause] identify the specific information on which [the plaintiff] relied, which would foreclose [the plaintiff's] reliance on other information.[44]

---

[42] *See Sanyo Elec. Co. v. Intel Corp.*, 2021 WL 747719, at *12 (Del. Ch. Feb. 26, 2021) (collecting cases).

[43] *Id.*

[44] *Id.* at *13.

So too here. The Integration Clause does not have clear anti-reliance language, any clear or express statement that the Tenant contractually promised not to rely on outside statements, nor any specific information on which the Tenant did rely, which would foreclose reliance on other information. The Integration Clause, thus, does not preclude or foreclose the Tenant's request for reformation.

Nor does it bar the amendment argument in Count III. Sure, the Integration Clause provides the Lease "cannot be amended or modified except by written instrument executed by both parties hereto."[45] But, "notwithstanding a contractual provision stating that a contract cannot be modified except in writing, a court may find that the parties modified their obligations orally, by conduct, or through waiver."[46] Thus, the Integration Clause does not, alone, preclude the amendment argument in Count III.[47]

---

[45] Lease § 24.10.

[46] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 659 (Del. Ch. Sep. 19, 2022), *judgment entered*, 2022 WL 5158862 (Del. Ch. Oct. 3, 2022), *and aff'd in part, rev'd in part, and remanded*, 304 A.3d 896 (Del. 2023).

[47] The Tenant also argues that the written invoices sent by the Landlord to the Tenant satisfy the Integration Clause's written instrument requirement. The Landlord counters that this position conflicts with the Tenant's alternate theory that the Parties always intended a year-over-year calculation. Parties can, of course, bring alternative claims and proffer alternate theories to support the relief requested. Ch. Ct. R. 8(e)(2) ("A party may set forth 2 or more statements of a claim or defense alternately or hypothetically, either in 1 count or defense or in separate counts or defenses."). At this stage, I will not force the Tenant to choose a theory, nor will I prematurely pass judgment on the viability of this theory.

### 2. The Anti-Waiver Clause does not bar Counts II or III.

Likewise, "notwithstanding a contractual provision that states that no party can waive any rights under an agreement, a court may find that a right has been waived."[48]  "The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by [t]he course of conduct of the parties."[49] The Anti-Waiver Clause is not, by its mere existence, a conclusive bar to Count II or III.

### 3. Counts II and III will turn on disputed facts.

Without a clear bar prohibiting the relief sought in Counts II and III, I turn to the merits. They are marred by disputes of material fact.

For Count II, the Tenant pleads that the Parties both "understood and believed at all relevant times that [the Tenant's] annual obligation, if any, to reimburse [the Landlord] for excess Real Estate Taxes would also be calculated by reference to the

---

[48] *Id.*

[49] *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) (citations omitted).  The Landlord attempts to distinguish *Pepsi-Cola* by emphasizing that the court found knowing acquiescence, whereas, here, the Landlord contends its billing was the product of unilateral mistake. But the Landlord's purported mistake is a dispute of fact, which precludes judgment on the pleadings.

Real Estate Taxes assessed for the immediately prior tax year."[50]   The Tenant

continued that the Parties "held this shared understanding at the time the original

Lease was executed and, subsequently, immediately prior to [the Tenant's] decision

to exercise its option to renew the Lease."[51]   The Landlord denies both allegations—

a dispute of material fact.

The Landlord appears to argue that these allegations do not provide the factual

predicate necessary to plead or prove a claim for reformation.   But the Landlord

chose to move under Rule 12(c), which requires an undisputed factual record. Here,

---

[50] D.I. 1, ¶ 47.

[51] D.I. 1, ¶ 48.  The Landlord takes issue with some of the Tenant's allegations being made "upon information and belief," arguing that the averments lack detail and documentary support. This Court has doubted the strength of allegations made "upon information and belief." *See, e.g.*, *O'Gara v. Coleman*, 2020 WL 752070, at *6 (Del. Ch. Feb. 14, 2020) (finding such allegations were not "supported by or inferred from well-pleaded facts in the [pleading]," and, as such, the Court "need not accept them as true"). *See also In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019) ("Pleading serial facts 'on information and belief' is no substitute for well-pled facts that will support a reasonable inference of wrongdoing.") (citation omitted). But, even excluding such averments, the Tenant has pled sufficient factual predicate which, when viewed against the Landlord's pleading, creates a material dispute of fact.

The Landlord also argues that the Tenant failed to plead "evidence indicating any mistake in drafting the contract terms[.]" D.I. 12, p.15. But parties need not "plead evidence," and the pleading stage is not the time for the Tenant to prove its claim. *See, e.g., Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *19 (Del. Ch. Jan. 25, 2024) ("Rule 9(b) does not require a plaintiff to plead every individual fact necessary to prevail at trial. Rule 9(b) certainly does not require pleading the evidence that the plaintiff will present."). Rather the Landlord, as the moving party, needed to demonstrate that there are no material facts in dispute and the Landlord is entitled to judgment as a matter of law. The Landlord failed to do so.

the material facts underlying these counts are in genuine dispute. As such, I cannot recommend judgment in the Landlord's favor.[52]

For Count III, likewise, the Tenant pleads, with particularity, that the Parties operated under the year-over-year calculation for over 20 years, reflecting a course of conduct which the Tenant argues amended the Lease. The Landlord denies that this course of conduct reflects agreed amendment, or a knowing waiver on the Landlord's part. Course of conduct and waiver are fact intensive inquiries, and the facts are hotly contested. Thus, under Rule 12(c), the Landlord is not entitled to judgment as a matter of law.[53]

---

[52] The Landlord also appears to argue that absent ambiguity in the four corners of the Lease, the Tenant cannot make an argument for reformation based on a mistake in memorialization of the agreement. I disagree. *See T.P. Inc. v. J&D's Pets, Inc.*, 1999 WL 135243, at *5 (Del. Ch. Feb. 26, 1999) ("It is true that evidence of agreements and negotiations prior to the adoption of a fully integrated contract are admissible to establish grounds for granting or denying the remedy of reformation.").

[53] Regarding course of conduct, the Landlord argues that a New Jersey Superior Court case, *Abramson-Obal, LLC v. Shah*, is instructive. 2021 WL 1541537 (N.J. Super. Apr. 20, 2021). At this stage, I disagree. *Shah* is an appellate court decision affirming in part, and reversing and remanding in other part, a post-trial decision from the lower trial court. That appellate court summarized the extensive evidentiary record before it ultimately held that the record did not support a finding that the landlord had abandoned its rights to charges not billed to the tenant. *Id.* at *7–8. Here, we are at the pleading stage, and the Landlord has moved for judgment on the pleadings under Rule 12(c). With the factual predicate surrounding the purported underbilling in genuine dispute, relief is not warranted. At most, *Shah* may prove persuasive on a motion for summary judgment or post-trial.

Counts II and III should survive the Motion. With these claims pending, the Landlord cannot demonstrate that it is entitled to judgment on its breach-of-contract claim in the Counterclaims.

**C.    Count IV is undisputed and the Parties should prepare a stipulation to that effect.**

In the Motion, the Landlord concedes that its ability to recover any previously underbilled reimbursement is subject to a three-year statute of limitations.  This concession matches the Landlord's pre-litigation conduct but is arguably a departure from the Landlord's answer. Therein, the Landlord denied that the Tenant is entitled to declaratory relief regarding the statute of limitations. I presume the Landlord's denial sprung from its position that there is no live controversy. Because the Parties agree that 10 *Del. C.* § 8106 prescribes a three-year limitations period on the Landlord's recovery, I invite the Parties to meet and confer regarding an appropriate stipulation and proposed order to resolve Count IV without further litigation.

**D.    Fees should not be shifted at this stage.**

The Landlord asks that its fees be shifted under the prevailing party fee shifting provision in the Lease (Section 24.8).[54]  At this early stage, I cannot declare

---

[54] Section 24.8 provides: "Attorney[s'] Fees. In any litigation between the parties regarding this Lease, the losing party shall pay to the prevailing party all reasonable expenses and court costs including attorneys['] fees incurred by the prevailing party. A party shall be considered the prevailing party if: (a) it initiated the litigation and substantially obtains the

either side "the losing party" as the provision requires (assuming enforceability, generally) and decline to inquire into fee shifting until I render my final decision on the merits of the remaining issues pending in this action.

## III.   CONCLUSION

For these reasons, I find the Motion should be denied.  I agree with the Landlord that Section 5.2, as written, is unambiguous and has the plain language meaning provided herein.  But much more remains to this action.  Unless the Parties can resolve their dispute amicably, this action is ripe for further factual development through discovery.  This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*
Magistrate in Chancery

---

relief it sought, either through a judgment or the losing party's voluntary action before arbitration (after it is scheduled), trial or judgment; (b) the other party withdraws its action without substantially obtaining the relief it sought; or (c) it did not initiate the litigation and judgment is entered for either party, but without substantially granting the relief sought."