# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD WALTON,<br><br>Plaintiff,<br><br>v.<br><br>AMANDA WALTON,<br><br>Defendant.<br>────────────────<br>AMANDA WALTON and KAREN K. ZEGEL, as trustee of the Amanda R. Walton 2025 Family Legacy Trust,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>RICHARD WALTON<br><br>Counterclaim Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2025-0279-SKR |

Submitted: June 20, 2025
Decided: September 2, 2025

## MEMORANDUM OPINION AND ORDER

*Upon Defendant/Counterclaim Plaintiffs' Motion for Judgment on the Pleadings*

## GRANTED IN PART, DENIED IN PART.

*Upon Plaintiff/Counterclaim Defendant's Motion for Summary Judgment*

## GRANTED IN PART, DENIED IN PART.

E. Chaney Hall, Esq., Griffin A. Schoenbaum, Esq., FOX ROTHSCHILD LLP, Wilmington, Delaware. Brett A. Berman, Esq., FOX ROTHSCHILD LLP, Philadelphia, Pennsylvania. *Attorneys for Plaintiff/Counterclaim Defendant Richard Walton.*

Tyler J. Leavengood, Esq., Jaclyn C. Levy, Esq., David A. Seal, Esq., Camilia R. Katkocin, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware. Margaret F. England, Esq., Michael Van Gorder, Esq., GELLERT SEITZ BUSENKELL & BROWN LLC, Wilmington, Delaware. Brian C. Vertz, Esq., POLLOCK BEGG, Pittsburgh, Pennsylvania. *Attorneys for Defendant/Counterclaim Plaintiff Amanda Walton and Counterclaim Plaintiff Karen K. Zegel, as Trustee of The Amanda R. Walton 2025 Family Legacy Trust.*


**Rennie, J.**

# I. INTRODUCTION

Mr. Richard Walton and Ms. Amanda Walton are estranged spouses who jointly hold certain shares in a company as tenants by the entirety. In connection with their divorce proceeding in a Pennsylvania court, the parties were ordered to transfer a portion of their jointly held shares into a trust created for the benefit of their children. As the parties negotiated the terms of the transfer document, discussions stalled when Mr. Walton sought to include certain clauses regarding his voting and indemnity rights in connection with the jointly held shares.

Mr. Walton first brought suit against Ms. Walton, seeking declaratory judgment on his rights related to the jointly held shares; Ms. Walton and the trustee of the children's trust filed a counterclaim. Presently before the Court are Mr. Walton's Motion for Summary Judgment and Ms. Walton's Motion for Judgment on the Pleadings. For the reasons stated below, each of the Motions is **GRANTED** in part and **DENIED** in part.

# II. BACKGROUND

## A. THE PARTIES

Plaintiff/Counterclaim Defendant, Richard Walton ("Mr. Walton"), is an individual who resides in Pennsylvania.[1]

---

[1] Compl. ¶ 11.

Defendant/Counterclaim Plaintiff, Amanda Walton ("Ms. Walton"), is an individual who resides in Pennsylvania.[2]

Counterclaim Plaintiff, Karen K. Zegel, is the trustee of The Amanda R. Walton 2025 Family Legal Trust (the "Children's Trust").[3] The Children's Trust is a Delaware Irrevocable Grantor Trust with situs in Delaware.[4]

## B. THE SHAREHOLDERS AGREEMENT AND THE VOTING PROXY

Mr. Walton was a co-founder, former president, and one of the initial directors of Noble Environmental, Inc. ("Noble"), a Delaware corporation in the waste management business.[5] On November 16, 2016, the initial shareholders of Noble, including Mr. and Ms. Walton, executed a Shareholders Agreement (the "Shareholders Agreement").[6] Pursuant to the Shareholders Agreement, Mr. Walton and Ms. Walton jointly hold 41,515 Series A Voting Common Shares of Noble as tenants by the entirety (the "Noble Shares").[7]

The Shareholders Agreement provides for an irrevocable proxy in Section 4.02 that grants Mr. Walton the right to vote the Noble Shares on behalf of Ms. Walton (the "Voting Proxy"). Section 4.02 states in relevant part:

---

[2] Compl. ¶ 12.
[3] For ease of reference, the Court will refer to the Counterclaim Plaintiffs collectively as "Ms. Walton" in this opinion.
[4] Countercl. ¶ 20.
[5] Compl. ¶ 18.
[6] Compl. ¶ 19, Ex. A [hereinafter "Shareholders Agreement"].
[7] Compl. ¶ 2.

Irrevocable Proxy and Power of Attorney. With Respect to Jointly Held Stock, each Non-Management Shareholder hereby appoints the Management Shareholder with whom such Non-Management Shareholder holds Jointly Held Stock, his or her proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote or act by written consent during the term of this Agreement with respect to such Jointly Held Stock.[8]

Pursuant to Section 3.04(e) of the Shareholders Agreement, "Jointly Held Stock" is defined as "any of the Series A Common Stock" that is "held by a Management Shareholder jointly with another Person (such Person, the 'Non-Management Shareholder'), whether as tenants by the entirety, joint tenants, tenants in common or otherwise[.]"[9] A "Management Stockholder" is defined as "a Shareholder who is a Director or an employee of [Noble.]"[10] Ms. Walton also executed a Consent of Spouse form to effectuate the Voting Proxy.[11] The Consent of Spouse form states, in relevant part:

[Ms. Walton] hereby agree[s] that [she] and any interest, including any community property interest, that [she] may have in any shares of Series A Common Stock of the Company subject to the Agreement shall be irrevocably bound by the Agreement, including any restrictions on the transfer or other disposition of any shares of Series A Common Stock or voting or other obligations as set forth in the Agreement.[12]

---

[8] Shareholders Agreement § 4.02.
[9] *Id.* § 3.04(e).
[10] *Id.* § 3.04(b).
[11] Compl. ¶ 26, Ex. B (Consent of Spouse).
[12] Compl. Ex. B (Consent of Spouse).

Because Mr. Walton was a director of Noble when the Shareholders Agreement was executed, the Noble Shares constituted "Jointly Held Stock" within the definition in Section 4.02.[13] Sometime before the Complaint was filed, Mr. Walton was removed as President and a director of Noble; Mr. Walton now holds no position at Noble.[14] As a result, Ms. Walton claims that Mr. Walton is no longer a Management Shareholder holding the voting rights over the Noble Shares.[15]

The Shareholders Agreement also prohibits any transfer of the company's Series A Common Stock, absent certain enumerated circumstances that are irrelevant here.[16]

## B. THE DIVORCE PROCEEDING AND CONSENT ORDER

Since January 27, 2023, Ms. Walton and Mr. Walton have been engaged in a divorce proceeding in the Family Division of the Court of Common Pleas of Allegheny County, Pennsylvania, No. FD23-007207-002 (the "Divorce Proceeding").[17] On March 1, 2024, upon the parties' stipulation, the Pennsylvania court issued a Consent Order of Court (the "Consent Order").[18] Pursuant to the

---

[13] *See* Shareholders Agreement § 3.04(e).
[14] Countercl. ¶ 33.
[15] *See* Countercl. ¶ 33.
[16] Shareholders Agreement § 3.01.
[17] Countercl. ¶ 32.
[18] Compl. ¶ 31, Ex. C [hereinafter "Consent Order"]; Countercl. ¶ 34.

4

Consent Order, the parties agreed to create a trust that holds part of the Noble Shares for the benefit of their children.[19] The Consent Order states, in relevant part:

> A new trust shall be created solely for the benefit of the children of the parties' marriage and the children's respective issue ("Children's Noble Trust") for the purpose of owning the Noble Shares with a value that is the lesser of fifty percent (50%) of the value of the Noble Shares or $13,610,000[.][20]

The Consent Order further instructed the parties to execute "any other documents needed to approve and transfer all of their Noble Shares as provided above."[21]

Due to the transfer restrictions contained in the Shareholders Agreement, a transfer to the trust requires an amendment to the Shareholders Agreement.[22] Hence, shareholders of Noble executed the First Amendment to Shareholders Agreement and Unanimous Consent to the Transfer of Shares (the "Amendment") to permit the transfer contemplated by the Consent Order.[23]

For the next steps, the parties hired a consulting firm, MPI, to conduct a valuation of their jointly held shares.[24] Once the valuation is completed, the parties were to execute the documents to effectuate the stock transfer in accordance with the Consent Order.

---

[19] *See* Consent Order.
[20] Consent Order ¶ 2(a).
[21] *Id.* ¶ 2(g).
[22] *See* Shareholders Agreement § 3.01.
[23] Compl. Ex. E (the Amendment).
[24] *See* Compl. ¶ 32; Countercl. ¶ 35.

## C. THE STOCKHOLDER ACTION

On May 8, 2024, a Noble stockholder filed a derivative action against Mr. Walton and some other Noble shareholders for breach of fiduciary duty (the "Stockholder Action").[25]   The Stockholder Action is currently pending in this Court.[26]

## D. SUBSEQUENT DISPUTES RELATING TO THE TRANSFER

On November 12, 2024, MPI completed its valuation of the Noble Shares.[27] The parties then exchanged drafts of transfer instruments,[28] which culminated in the current dispute.

On February 2, 2025, Mr. Walton's counsel proposed that the document effectuating the transfer should "include indemnity language and clarify our view of the voting rights for the shares."[29]   Mr. Walton's proposed draft contained two provisions to which Ms. Walton object.  The first proposed provision states: "[t]he [Trust] hereby . . . agrees that [Mr. Walton] shall retain all voting rights of the Interest [in the transferred shares]."[30]  The second proposed provision states: "[s]ince entry

---

[25] Countercl. ¶ 39; *see generally* Compl., *Schatzow v. Stork*, 2024-0485-BWD (Del. Ch. May 8, 2024), Dkt. 1.

[26] Countercl. ¶ 10.  Mr. Walton denies all allegations made against him in that action.

[27] Countercl. ¶ 47.

[28] *Id.*

[29] Countercl. ¶ 49.

[30] Countercl. ¶ 52 (emphasis added).

of the . . . Consent Order, [Mr. Walton] was named as a defendant in a lawsuit involving certain alleged transactions that occurred during the marriage. The lawsuit may result in a marital liability for which both parties are responsible."[31] The provision further proposed:

> "[a]ll liabilities that may arise as a result of transactions that occurred during the marriage shall be marital liabilities and shall be equally divided between the parties if/when they become due. The parties shall hold harmless, indemnify and defend the other party in connection with his/her respective share of any future marital liability . . . .]"[32]

Ms. Walton did not accept Mr. Walton's proposed terms.[33] Instead, she filed a "Motion to Enforce Consent Order of Court" in the Divorce Proceeding, in which she argued that Mr. Walton attempted to "impose new conditions upon the transfer of Noble Shares" and "modify" the Consent Order.[34] On March 24, 2025, the Pennsylvania court issued an order (the "Enforcement Order"), reiterating that Mr. Walton and Ms. Walton must "sign any/all documents necessary to effectuate the transfer of Noble Shares[.]"[35] The Enforcement Order does not expressly address whether or not Mr. Walton's proposed terms may be included in the document effectuating the transfer.[36]

---

[31] Countercl. ¶ 53 (emphasis added).
[32] Countercl. ¶ 53.
[33] *See* Countercl. ¶¶ 54–55.
[34] Compl. Ex. D (Motion to Enforce) ¶ 30.
[35] Countercl. ¶ 16; Defendant-Counterclaim Plaintiffs' Motion to Expedite (D.I. No. 13) Ex. 4 (the Enforcement Order).
[36] *See id.*

### E. PROCEDURAL BACKGROUND

On March 13, 2025, Mr. Walton filed a one-count Verified Complaint (the "Complaint") seeking declaratory judgment.[37] Mr. Walton requests the Court to issue the following declarations:

> A. Under Section 4.02 of the Noble Shareholders Agreement and the Consent of Spouse, Mr. Walton currently holds all voting rights associated with the shares of Series A Common Stock that he holds jointly with Ms. Walton as tenants by the entirety (i.e., the Noble Shares); and
>
> B. Mr. Walton will retain his voting rights in connection with the shares of Series A Common Stock that will be transferred to Ms. Walton individually and to the Amanda R. Walton 2025 Family Legacy Trust in accordance with the Consent Order.[38]

On April 18, 2025, Ms. Walton filed her Answer and Counterclaim.[39] The Counterclaim contains two counts of declaratory judgment claims. Count I, which largely mirrors the declarations sought by Mr. Walton, seeks an order declaring that "any proxy and voting rights Mr. Walton holds over Jointly Held Stock will not apply to any shares transferred to Ms. Walton or the Children's Trust."[40] Count II seeks an order declaring that "Mr. Walton cannot condition the transfer of Noble Shares to

---

[37] Compl. (D.I. No. 1).
[38] Compl. at 16.
[39] Answer to Verified Complaint and Verified Counterclaims (D.I. No. 13). The Counterclaim portion of the document will hereinafter be referred to as "Countercl."
[40] Countercl. ¶ 70.

Ms. Walton and the Children's Trust upon an obligation to indemnify Mr. Walton for any liability against Mr. Walton in the Stockholder Action."[41]

On May 21, 2025, Mr. Walton filed a Motion for Summary Judgment on all the claims in this matter.[42]  On the same day, Ms. Walton filed a Motion for Judgment on the Pleadings, also seeking judgment on all the claims in the action.[43]  After briefing by the parties,[44]  the Court heard oral argument on June 20, 2025.

### III.  THE PARTIES' CONTENTIONS

#### A.  MR. WALTON'S CONTENTIONS

In pressing for the continuing efficacy of the Voting Proxy, Mr. Walton argues that the voting rights granted under the Proxy should remain with him throughout the term of the Shareholders Agreement.[45]  According to Mr. Walton, the term "Management Shareholder" as defined in the Shareholders Agreement refers to Mr. Walton, among other shareholders; and thus, he remains a "Management Shareholder" regardless of whether he currently holds a position at Noble.[46]  Mr. Walton further maintains that the policy rationale that disfavors irrevocable proxies

---

[41] Countercl. ¶ 75.

[42] Pl.-Countercl. Def. Richard Walton's Mot. Summ. J. (D.I. No. 21).

[43] Def.-Countercl. Pls.' Mot. J. Pleadings (D.I. No. 22).

[44] Pl.-Countercl. Def. Richard Walton's Opening Br. Supp. His Mot. Summ. J. (D.I. No. 21) [hereinafter "Pl.'s OB"]; Def.-Countercl. Pls.' Opening Br. Supp. Their Mot. J. Pleadings (D.I. No. 22) [hereinafter "Def.'s OB"]; Pl.-Countercl. Def.'s Answering Br. (D.I. No. 28) [hereinafter "Pl.'s AB"]; Def.-Countercl. Pls.' Answering Br. (D.I. No. 29) [hereinafter "Def.'s AB"].

[45] Pl.'s OB at 19–28.

[46] Pl.'s OB at 20–25.

does not apply here.[47]  Alternatively, Mr. Walton argues that Ms. Walton acquiesced to the continuing viability of the Voting Proxy when she permitted Mr. Walton to sign the Amendment on her behalf.[48]

As to Ms. Walton's counterclaim regarding his proposed terms, Mr. Walton argues that Ms. Walton's claim regarding the indemnity language is unripe for adjudication.[49]  This, according to Mr. Walton, is because the Stockholder Action has not resulted in an adverse judgment against Mr. Walton, and it may never materialize.[50]  In addition, Mr. Walton argues that he is entitled to freely negotiate the terms of the transfer of the Noble Shares, including the indemnification language.[51]

## B. MS. WALTON'S CONTENTIONS

In response, Ms. Walton contends that the Voting Proxy only applies to a "Jointly Held Stock," which by definition must be held by a "Management Shareholder."[52]  Since Mr. Walton is no longer a director or employee of Noble, Ms. Walton argues, he is not a "Management Shareholder" and thus does not hold the voting rights delegated under the Voting Proxy.[53]  Moreover, Ms. Walton takes the

---

[47] Pl.'s AB at 19–21.
[48] Pl.'s OB at 25–28.
[49] Pl.'s OB at 29–31.
[50] *Id.*
[51] Pl.'s OB at 31–33.
[52] Def.'s OB at 19–20.
[53] *Id.* at 20–21.

position that established Delaware precedent requires the existence of express language for a voting proxy to survive after a transfer of the attendant shares—and the Voting Proxy does not contain such language.[54] In response to Mr. Walton's acquiescence argument, Ms. Walton posits that he did not execute the Amendment on her behalf as a proxy, but as a joint tenant with her express approval.[55] Ms. Walton further maintains that the doctrine of acquiescence would not affect the invalidity of the Voting Proxy following the transfer to the Children's Trust, as the Children's Trust never acquiesced to the Voting Proxy.[56]

In addition, Ms. Walton argues that Mr. Walton's delay in executing the transfer document in an attempt to secure his proposed terms violates the Consent Order and the Enforcement Order.[57]

## IV.  STANDARD OF REVIEW

### A.  MOTION FOR SUMMARY JUDGMENT

Pursuant to Court of Chancery Rule ("Rule") 56, summary judgment is appropriate where the record shows that "there are no questions of material fact and a party is entitled to judgment as a matter of law."[58] In determining a motion for summary judgment, the Court must view the facts in the light most favorable to the

---

[54] *Id.* at 22–23.
[55] Def.'s AB at 4.
[56] *Id.* at 14–18.
[57] Def.'s AB at 21–22.
[58] *See N. Fork Bancorp., Inc. v. Toal*, 825 A.2d 860, 865 (Del. Ch. 2000), *aff'd sub nom. Dime Bancorp, Inc. v. N. Fork Bancorporation, Inc.*, 781 A.2d 693 (Del. 2001).

11

nonmoving party, and the moving party has the burden of demonstrating that there is no material question of fact.[59]

## B. MOTION FOR JUDGMENT ON THE PLEADINGS

The Court grants a motion for judgment on the pleadings pursuant to Court of Chancery Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law.[60]  When considering a Rule 12(c) motion, the Court "must assume the truthfulness of all well-pled allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff."[61]  "The [C]ourt must therefore accord [a] plaintiff[] opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Rule 12(b)(6)."[62]  On a Rule 12(c) motion, the court may consider documents integral to or incorporated into the complaint by reference.[63]

## V.  ANALYSIS

### A. EFFECTIVENESS OF THE VOTING PROXY

A core dispute between the parties—the subject of both Mr. Walton's only claim and Ms. Walton's Count I—concerns the continuing effectiveness of the

---

[59] *Whittington v. Dragon Grp. L.L.C.*, 2008 WL 4419075, at *3 (Del. Ch. June 6, 2008).
[60] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).
[61] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000).
[62] *Id.*
[63] *Id.*

Voting Proxy granted to Mr. Walton. Delaware public policy disfavors an irrevocable voting proxy because "by its very nature, a proxy, which temporarily splits the power to vote from the residual ownership claim of the stockholder, has the potential to create misalignment between the voting interest and the economic interest of shares."[64] Therefore, "historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares."[65] "[A] Delaware court will not look to extrinsic evidence in interpreting an irrevocable proxy but will rely on the four corners of the proxy instrument itself."[66] "Where the irrevocable proxy is ambiguous, the ambiguity will be construed against the rights of the proxy holder."[67] In other words, when the parties set forth two opposing but reasonable interpretations of a proxy, the non-proxy holder's interpretation should prevail.[68]

### (a) Current Voting Rights

The first disagreement between the parties is whether Mr. Walton currently holds the voting rights associated with the Noble Shares.[69] Mr. Walton contends that the term "Management Shareholder"—defined in the Shareholders Agreement as "a Shareholder who is a Director or an employee of the Company"—is meant to

---

[64] *Daniel v. Hawkins*, 289 A.3d 631, 648 (Del. 2023).
[65] *Id.*
[66] *Id.* at 645.
[67] *Id.*
[68] *Id.* at 658.
[69] Compl. ¶ 50.

identify Mr. Walton.[70]  Mr. Walton specifically cites to Section 2.01(a), which identified Mr. Walton as a Director.[71]  Ms. Walton, on the other hand, counters that Mr. Walton is no longer a "Management Shareholder" after he lost his position at Noble.[72]

The Court believes that Ms. Walton's position is a reasonable interpretation of the terms of the Shareholders Agreement, and that she prevails under the Delaware rule that strictly construes ambiguity against a proxy holder.  The proxy language contained in Section 4.02 states that Ms. Walton appoints Mr. Walton "to vote or act by written consent during the term of this Agreement with respect to *such Jointly Held Stock*."[73]  Section 3.04(e) further defines "Jointly Held Stock" as "any of the Series A Common Stock (such Series A Common Stock. 'Jointly Held Stock') [that] *is* held by a Management Shareholder jointly with another Person . . . ."[74]  And Section 3.04(b) defines a "Management Shareholder" as "a Shareholder who *is* a Director or an employee of the Company."[75]

The present tense use of "is" in Section 3.04 permits two interpretations.  From one perspective, it may be interpreted to encompass the shares that qualified as "Jointly Held Stock" at the time the agreement was executed.  That supports Mr.

---

[70] Pl.'s AB 21–22.
[71] Shareholders Agreement § 2.01.
[72] Def.'s Mot. at 21–22.
[73] Shareholders Agreement § 4.02 (emphasis added).
[74] *Id.* § 3.04(e) (emphasis added).
[75] *Id.* § 3.04(b) (emphasis added).

14

Walton's position. On the other hand, it may be interpreted to only apply to the shares jointly held by a person who qualifies as a "Management Shareholder" at the time the person asserts a voting right related to the shares. This is Ms. Walton's argument. Ms. Walton's reading is at least a reasonable reading of the contractual terms. This creates an ambiguity, and the Court will interpret the ambiguity in favor of Ms. Walton, the non-proxy holder.

Contrary to Mr. Walton's contention, there is no unambiguous language in the Shareholders Agreement stating that he shall remain a "Management Shareholder" regardless of his position at Noble. Section 2.01(a), which he cites, only identified him as one of the board members at the time of the Shareholders Agreement's execution: "As of the date hereof, the Board [of Directors] consists of Richard Walton [and four other members.]"[76] It does not provide that such board members would remain a "Director" within the meaning of the contract even if they were later removed from the Board. If the Shareholders Agreement intended *Mr. Walton* specifically to hold the Voting Proxy throughout its term, it could have expressly stated so. But it does not. Under Delaware's rule which strictly construes ambiguities in voting proxies against a purported proxy holder, Mr. Walton's argument falters.

*(b) Voting Rights After the Transfer*

---

[76] Shareholders Agreement § 2.01(a).

Even if Mr. Walton is somehow deemed to be a "Management Shareholder" who holds the Voting Proxy, that Voting Proxy would be extinguished once the parties complete a transfer of their shares to the Children's Trust. This Court's previous decision in *Hawkins v. Daniel* is instructive here.[77] In *Hawkins*, the Court refused to find that the irrevocable proxy ran with the shares after a sale to a third party.[78] The Court noted that, under Delaware law, "[a]bsent specific and explicit language to the contrary, a sale of the shares that are the subject of an irrevocable proxy operates to terminate the proxy" because "the grantor no longer owns the securities or membership interest."[79] Therefore, a subsequent owner would only be bound if he "both knows about an irrevocable proxy *and* the irrevocable proxy contains plain and unambiguous language binding a subsequent owner."[80] The Court in *Hawkins* found no such language.[81]

The Court reached its conclusion despite acknowledging that "[t]here is language which might be construed" to bind a subsequent owner.[82] That contractual provision stated: "[t]his Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder, the Holders, and their respective heirs, devises, legatees,

---

[77] 273 A.3d 792, 821 (Del. Ch.), *judgment entered*, (Del. Ch. 2022), *aff'd*, 289 A.3d 631 (Del. 2023).
[78] *Id.* at 808.
[79] *Hawkins v. Daniel*, 273 A.3d at 820.
[80] *Id.* (emphasis in original).
[81] *Id.* at 832–33.
[82] *Id.*

16

personal representatives, agents and *permitted assigns*."[83]  The Court rejected the defendants' argument that the phrase "permitted assigns" encompassed subsequent owners.[84]  The Court reasoned that a "transfer" is a broader term that generally refers to "a change involving all aspects of ownership," while an "assign" is a narrow term that generally refers to "a change involving specific rights."[85]  Therefore, the contractual language, at best, "*could* be construed to encompass a transferee[,]" which falls short under the strict construction standard.[86]  The Court concluded, "if the parties had wanted [a contractual provision] to cause the Irrevocable Proxy to bind a subsequent owner, then they should have stated clearly that the Irrevocable Proxy binds the Stockholder and the Stockholder's transferees."[87]

Here, Mr. Walton does not point to any specific contractual provision that *could* be construed to cause the Voting Proxy to bind the Children's trust after the transfer; nor can he.  Nothing in the Shareholders Agreement states that a subsequent owner of the Noble Shares would be bound by a voting proxy.  On the contrary, under the terms of Section 4.02, the Voting Proxy only applies to "Jointly Held Stock," which by definition must be "held by a Management Shareholder jointly with another Person[.]"[88]  Therefore, it is a sensible reading of the contract that the

---

[83] *Id.* at 826 (emphasis added).
[84] *Id.* at 826–28.
[85] *Id.*
[86] *Id.* at 828 (emphasis in original).
[87] *Id.*
[88] Shareholders Agreement § 3.04(e).

Noble Shares would no longer constitute "Jointly Held Stock" once they are transferred to—and, thereafter, solely owned by—the Children's Trust.

Mr. Walton contends that the rule that requires to strict construction of a voting proxy is inapplicable here. According to Mr. Walton, that rule is justified by the policy concern regarding a misalignment of interests when voting rights and economic rights are severed.[89] Mr. Walton argues that such a concern is non-existent here because "Noble is Mr. Walton's life's work" and "Mr. Walton is better suited than Ms. Walton (or the Children's Trust) to vote the Noble Shares in a way that will serve the corporate goal of stockholder wealth maximization."[90] In addition to the fact that the Court cannot accept the blanket assertion that Mr. Walton is "better suited" to vote the Noble Shares, the principle of strictly construing a proxy document against a purported proxy holder simply does not apply differently based on the identity of the purported proxy-holder. Rather, the principle applies broadly to any document that purportedly creates a proxy, as it is based on a recognition of "the *fundamental nature* of a proxy as an instrument that divides the economic rights and the voting rights that attach to share ownership."[91] Hence, the Noble Shares that are transferred to the Children's Trust would not be subject to any voting proxy.

---

[89] Pl.'s AB at 19.

[90] Pl.'s AB at 20.

[91] *Daniel v. Hawkins*, 289 A.3d 631, 648 (Del. 2023). At oral argument, Mr. Walton's counsel argued that the strict construction rule does not apply, attempting to distinguish *Hawkins* based on the fact that *Hawkins* involved a third-party purchaser for value. That argument also fails for the same reason.

*(c) The Defense of Acquiescence*

Alternatively, Mr. Walton asserts the doctrine of acquiescence in an effort to hold onto the voting rights over the Noble Shares.[92] When the Amendment was executed, Ms. Walton permitted Mr. Walton to sign the Amendment on her behalf, even though he was arguably no longer a Management Shareholder and did not hold a proxy or power-of-attorney over the Noble Shares.[93] Mr. Walton thus contends that Ms. Walton acquiesced to Mr. Walton's continued exercise of the voting proxy and cannot now assert that she holds the voting rights to the shares.[94] This contention is unfounded.

Under the doctrine of acquiescence, a person is deemed to have acquiesced in an act when he "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[95] Acquiescence is an equitable defense, based upon the principle that "equity will not permit a complainant to stultify himself by complaining against acts in which he participated or in which he has demonstrated his approval by sharing in

---

[92] Pl.'s OB at 25.
[93] *Id.* at 25–26.
[94] *Id.* at 25–28.
[95] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014).

19

the benefits—even though the suit might otherwise be meritorious."[96]  It essentially

works as an estoppel— a person is estopped from asserting an action when her

silence made her "complicit in the very breach" for which she brings the action.[97]

Here, the only act for which Ms. Walton may have demonstrated her approval

was Mr. Walton's signing of the Amendment on her behalf, which main purpose was

to effectuate a transfer of the Noble Shares.  She did not approve his exercise of the

voting rights in the future.  Therefore, the doctrine of acquiescence at most precludes

Ms. Walton from challenging the execution of the Amendment— to which there is

no challenge.

In addition, even if Ms. Walton acquiesced to Mr. Walton's retention of the

voting rights, the Children's Trust—which did not exist at the time the Amendment

was executed—could not have acquiesced to the same.  Thus, the doctrine of

acquiescence cannot conceivably justify Mr. Walton's exercise of the voting rights

once the shares are transferred to the Children's Trust.

Hence, the Court **GRANTS** Ms. Walton's Motion as to Count I of Mr.

Walton's Complaint and Count I of Ms. Walton's Counterclaim, and accordingly,

**DENIES** Mr. Walton's Motion on those claims.

### B.  MR. WALTON'S RIGHT TO NEGOTIATE THE INDEMNITY OBLIGATION

---

[96] *Wechsler v. Abramowitz*, 1984 WL 8244, at *2 (Del. Ch. Aug. 30, 1984).
[97] *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014).

In Count II of her Counterclaim, Ms. Walton seeks a declaration stating that "Mr. Walton cannot condition the transfer of Noble Shares to Ms. Walton and the Children's Trust upon an obligation to indemnify Mr. Walton for any liability against Mr. Walton in the Stockholder Action."[98]

In considering a declaratory judgment action, a Delaware must first make a threshold determination that an "actual controversy" exists.[99] An "actual controversy" must satisfy the following elements:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[100]

Moreover, even if an actual controversy exists, the Court may exercise discretion in deciding whether to entertain a declaratory judgment claim.[101] The Court may refuse to enter a declaratory judgment "where such judgment or decree, if rendered or entered, will not terminate the uncertainty or controversy giving rise to the proceeding."[102] The Court may also properly decline to entertain a declaratory

---

[98] Countercl. ¶ 75.
[99] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014).
[100] *Id.* at 1217 (quoting *Stroud v. Milliken Enterprises, Inc.*, 552 A.2d 476, 479–80 (Del. 1989)).
[101] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014).
[102] 10 *Del. C.* § 6506.

21

judgment claim where another remedy is available and would be more "effective or efficient."[103]

Here, the Court will refuse to enter the declaratory judgment sought by Ms. Walton's Count II. The essence of the declaration sought in the claim is rather amorphous, but regardless of how the claim is construed, declaratory judgment is inappropriate. To the extent that Ms. Walton seeks a declaration that Mr. Walton's refusal to execute the transfer without an indemnity agreement is impermissible under the Consent Order, Ms. Walton clearly has a better remedy in moving to enforce that order in the Pennsylvania court that issued the Order. And to the extent that the claim is requesting an allocation of the liability Mr. Walton may incur from the Stockholder Action, that issue is also within the purview of the Divorce Proceeding in the family court. Therefore, the Court will refuse to entertain the claim because relief in the Pennsylvania family court would be more "effective or efficient."[104]

At oral argument, Ms. Walton's counsel argued that this count primarily asks the Court to declare that, by operation of Delaware law, "indemnification is not a necessary element in order for the shares to be transferred."[105] Ms. Walton's counsel suggested that there is a dispute as to whether a transfer document without the

---

[103] *Reylek v. Albence*, 2023 WL 4633411, at *6 (Del. Super. July 19, 2023).
[104] *See id.*
[105] June 20, 2025 Oral Argument Hr'ng Tr. (D.I. No. 34) [hereinafter "Tr."] 52:12–17.

indemnification language proposed by Mr. Walton would be legally effective under Delaware law, and, as a result, the Pennsylvania court was reticent to explicitly order Mr. Walton to execute the transfer instrument free of his proposed terms.[106]

The Court also refuses this request. This requested declaration is substantially different from the one sought in the Counterclaim and was not clearly presented in the briefing that Ms. Walton submitted. More importantly, Mr. Walton's counsel responded at oral argument that it is not their argument that an indemnity provision is *legally* necessary for a transfer of shares.[107] Mr. Walton's counsel clarified that it is Mr. Walton who *personally* "views it as necessary to have this indemnification language," that "he wants it."[108] Since Mr. Walton's counsel acknowledged that there is no dispute as to whether a legally valid transfer may be executed without Mr. Walton's proposed indemnity provision, this request does not pertain to an actual "controversy involving the rights or other legal relations" between the parties.[109] Accordingly, the Court will **GRANT** Mr. Walton's Motion—and thus **DENY** Ms. Walton's Motion—on Count II of Ms. Walton's Counterclaim.

## C. THE PARTIES' REQUEST FOR FEES AND EXPENSES

---

[106] Tr. 54:5–12, 55:5–9.
[107] Tr. 61:1–9.
[108] *Id.*
[109] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014).

23

Finally, both parties seek an award of their costs and expenses, including reasonable attorneys' fees, pursuant to Section 6.11 of the Shareholder Agreement.[110] Section 6.11 states in relevant part:

> In the event that any party files a suit to enforce the covenants contained in this Agreement (or obtain any other remedy in respect of any breach thereof) the prevailing party in the suit shall be entitled to receive in addition to all other damages to which it may be entitled, the costs incurred by such party in conduction the suit, including reasonable attorney's fees and expenses.[111]

In order to award fees, the Court must determine if either party was "the prevailing party in the suit." "Prevailing party" is a term of art, and courts traditionally apply that term to use "an all-or-nothing approach involving an inquiry into which party predominated in the litigation."[112] To achieve "predominance in the litigation," a litigant should prevail on the case's "chief issue."[113]

In this case, there are two issues that can be deemed "chief issues": the voting rights over the Noble Shares and the proposed indemnity obligation term. Here, Ms. Walton prevails on the former, while Mr. Walton prevails on the latter.[114] Therefore,

---

[110] *See* Countercl. ¶ 71; Compl. ¶ 51.

[111] Shareholders Agreement § 6.11.

[112] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022).

[113] *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015), *judgment entered sub nom. Caiola Fam. Tr. v. PWA, LLC* (Del. Ch. 2015), *supplemented sub nom. 2009 Caiola Fam. Tr. v. PWA, LLC* (Del. Ch. 2016).

[114] As discussed above, Mr. Walton "prevails" only in the sense that the Court declines to enter the declaratory judgment requested by Ms. Walton. The Court makes no judgment as to the propriety of Mr. Walton's request for an indemnity provision.

neither party "predominated" in this suit. Accordingly, there is no "prevailing party," and no costs and expenses will be awarded.

## VI. CONCLUSION

For the foregoing reasons, Ms. Walton's Motion for Judgment on the Pleadings is **GRANTED** as to Mr. Walton's Count I (his only count) and Ms. Walton's Count I, and **DENIED** as to Ms. Walton's Count II. Simultaneously, Mr. Walton's Motion for Summary Judgment is **GRANTED** on Ms. Walton's Count II, and **DENIED** as to Mr. Walton's Count I and Ms. Walton's Count I.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge